```
 1                IN THE DISTRICT COURT OF THE UNITED STATES
                        DISTRICT OF SOUTH CAROLINA
 2                         CHARLESTON DIVISION

 3   UNITED STATES OF AMERICA,    )          2:10-CR-1104
                                  )
 4                  Plaintiff     )          Charleston,
                                  )          South Carolina
 5   VS                           )          September 13, 2012
                                  )
 6   MARCUS GIBBS,                )
                                  )
 7                  Defendant     )

 8                   TRANSCRIPT OF SENTENCING HEARING
                   BEFORE THE HONORABLE RICHARD M. GERGEL,
 9                     UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Plaintiff:     MR. PETER PHILLIPS
                            Assistant United States Attorney
12                          P.O. Box 978
                            Charleston, SC 29402
13

14

15

     For the Defendant:     MR. J. JOSEPH CONDON, JR., ESQ.
16                          3842 Leeds Avenue
                            North Charleston, SC 29405
17

18

19

20

21

22

23   Court Reporter:        Amy C. Diaz, RPR, CRR
                            P.O. Box 835
24                          Charleston, SC 29402

25             Proceedings recorded by mechanical shorthand,
     Transcript produced by computer-aided transcription.
```

1          THE COURT:  Mr. Phillips, are you ready to call your

2     next case, sir?

3          MR. PHILLIPS:   Yes, sir.  Yes, Your Honor.  This is

4     *United States of America vs. Marcus Gibbs*.  This is Criminal

5     Number 2:10-1104.  We are here for sentencing.  And I know we

6     have multiple issues that have arisen in the last 24 hours,

7     and I think the first one would be Mr. Condon's request for

8     continuance.  I'll let him speak on that matter.

9          THE COURT:  Glad to hear from you, Mr. Condon.  Good

10    morning, sir.

11         MR. CONDON:   Good morning, Your Honor.

12         In order to make sure that I have done everything I

13    possibly can for Marcus, one of the issues that came up is

14    that the mandatory minimum I think should be 10 years as

15    opposed to 20 years.  He pled to a criminal conspiracy and

16    the Indictment makes no reference to any type of drugs, and

17    it was strictly a state criminal conspiracy charge.  And so I

18    think the mandatory minimum issue, it makes a big difference

19    in this case in terms of the understanding or the parameters

20    with regard to sentencing.

21         And then the second issue is the family has hired

22    Mr. Cohen, who is a local detective, and they have asked --

23    and they have just scraped up that money for him to do that

24    to look into various issues.  And I would like, you know,

25    Mr. Cohen to address the Court on what he's doing and the

1    reason why it's important for them to do it.  I just want to

2    be able to make sure that I have done everything I can on

3    behalf of my client with regard to this case.

4            THE COURT:  Well, I commend you for that.  Let's

5    first of all address this 851 issue.

6            Mr. Phillips?

7            MR. PHILLIPS:   Yes, sir.  The -- we believe --

8    well, obviously I didn't have -- at some point when we

9    determined -- I'll go back in time.  When we filed the

10   enhancement, we got the documents.  And at some point, I

11   believe, I can't -- this case has a lot of documents and we

12   have been through a lot of things -- but what's clear from

13   the documents and from the sentencing sheet is that he pled

14   to a conspiracy under the Controlled Substances Act.  So that

15   would be our first point.  And we are making efforts right

16   now in case it became an issue to get information, the

17   underlying information, which I probably have in my file

18   somewhere, regarding the incident report.

19           But the determination was made before we filed the

20   enhancement that, first of all, he pled under the Controlled

21   Substances Act, so it was essentially an 846, so it was a

22   drug offense felony drug offense.  And that the incident did,

23   in fact, because of that -- and I believe we had some

24   incident reports -- involved drugs.  And that would -- again,

25   that's just my recollection, and I'm trying to get the

incident report so we'll know.

But so I think legally that we went on that issue. That doesn't affect, you know, his ability to -- unless it's been filed for a long time, he hasn't filed a written objection if his 851 applies.

And the other issue is this, that there is an assumption -- and that's actually since I heard Mr. Condon last night -- one of the things I have been looking into is this assumption that we are limited to the Indictment in determining whether it's a felony drug offense, and certainly that's under the categorical approach, when you are determining a career offender under the Guidelines, an armed career criminal, that can be the case. But when you read 851, it talks about -- it talks about other -- it talks about the record of the defendant and other facts to be relied upon by the Government. So -- and I can't find a case -- and granted, I didn't have a lot of time to look, but I can't find a case that says you are limited to the Indictment itself when determining whether it was a felony drug offense, because we've got to determine what the potential penalty was, which no problem there, and then we've got to determine that it involved drugs.

And so my position at this time, given my limited research on the issue, is that it's just an assumption that's always been made, that you can't look outside of the

1   Indictment itself to determine if it's a felony drug offense.

2         With that being aside, we have the sentencing sheet

3   having it under the Controlled Substance Act.

4         Now, as far as the continuance is concerned, that's

5   sort of a different issue.  And in our estimation, the only

6   change that makes is in the floor of the sentence.  It

7   doesn't change the mandatory minimum, the maximum, it doesn't

8   change the max, it only changes the mandatory minimum.  It

9   doesn't affect the Guidelines.  I don't think anywhere in the

10  Presentence Report that any Guideline is generated or

11  affected by the mandatory minimum.  That's a statutory issue

12  wholly irrelevant, or wholly separate from the Sentencing

13  Guidelines.

14        So that's the difference.  So really the only skin

15  in the game from the Government's perspective is the floor of

16  the sentence that you may -- you know, the range that you

17  have to sentence him which is life, either down to 20 or 10.

18        So I --

19        THE COURT:  Let me tell you, Mr. Phillips --

20        MR. PHILLIPS:   I'm not going to concede the issue.

21        THE COURT:  I'm not sure it matters.  I've got to

22  tell you, what concerns me is when I look at the Indictment,

23  he's -- Mr. Gibbs was indicted under common law conspiracy,

24  16-17-410, and it's called Indictment for Criminal

25  Conspiracy.  On the plea sheet it references a different

statutory section, 44-53-370, which is the drug conspiracy
statute but it refers to it as criminal conspiracy.

MR. PHILLIPS:   Yes, sir.

THE COURT:  And that just seems ambiguous to me.
There is sort of an ambiguity in the documents, and I think
it's much ado about nothing frankly.

MR. PHILLIPS:   And that was my point.

THE COURT:  And I'm kind of -- you know, obviously
the mandatory minimums, which no District Judge is crazy
about, um, tells us our floor, our ceiling or whatever.  And
I note them, but I don't drive -- that doesn't drive my
sentences.  My sentencing is based on what is sufficient and
not greater than necessary to accomplish the purposes of the
act.  And the only way it affects me is if I reach a number
and then it's somehow outside of the mandatory
maximum/minimum then it limits me on what I can do.

So it's -- to me it's not a big deal.  And obviously
here we have a Guideline that is life at this point.  We've
got objections we've got to take up and so forth, but we are
a long way from 10 years and a long way from 20 years,
frankly.  And I want to hear all the arguments and if it
becomes more material, then that's something we need to
address.

But my own inclination I've got to say is I think on
the documents I have in front of me, there is at least some

ambiguity on this issue because it specifically -- that he pled to something which refers to the very charge of the Indictment, which is a common law crime, though it also references on this document the drug conspiracy. It's just a little ambiguous to me. And for something this weighty, I would be -- you know, I would not -- I would not tend to want to rely on something that's an ambiguous document.

MR. PHILLIPS: Yes, sir. And I was -- that is sort of the point I was getting to is that while I don't want to concede the issue, but I'm not -- I don't think we need to delay it in order to -- I'll give up the 10 years, the 20 years.

THE COURT: I'm going to simply say on the document that's in front of me, I'm not persuaded that the 851 enhancement is indicated. So I'm operating here today on the assumption it's 10 to life.

MR. PHILLIPS: Then just for the record and for our positions, we have other cases that -- we are not waiving any arguments.

THE COURT: Nobody is waiving anything. I just -- I'm -- if it became something important, I'm glad to look at other acceptable documents, but what I have, which is the -- let me just refer to Docket 507, which is the 851 enhancement, I have the Indictment, the -- I'm sorry, the -- you know, the sentencing sheet here, and I have the

1    Indictment.

2         MR. PHILLIPS:   Yes, sir.

3         THE COURT:  And those are the documents I've relied

4    upon.  And I suppose we ought to make them part of the

5    record.  Do you have those -- do we have extra copies of

6    those documents?  Specifically the reference -- the guilty

7    plea signed by Mr. Gibbs, sentencing date of March 13th,

8    2000, and the Indictment for criminal conspiracy.  Do we have

9    copies of that -- extra copies of those two documents?

10        MR. CONDON:   Yes, sir, we do, and I've certified

11   them.

12        THE COURT:  Let's mark those as an exhibit.  I would

13   like to have them in the record.  Let me just take a look and

14   see if we are talking about the same document, Mr. Condon.

15        MR. CONDON:  Yes, sir.

16        THE COURT:  We are going to mark this as Court

17   Exhibit 1, which is the -- which are those documents.  And

18   I -- and Mr. Phillips, I just -- I'm -- for purposes of this,

19   I'm -- you know, I'm acting on the assumption the range is 10

20   to life.

21        MR. PHILLIPS:   Yes, sir.

22        THE COURT:  And I'm not definitively ruling on this,

23   but on the documents I have, and if it becomes important

24   later, I'm more than prepared to reconsider based on

25   additional documents the Government may have a chance to --

1    you know, I think we need to proceed with the sentencing.

2    We've postponed this several times.  And so at this point I

3    think the defendant is entitled to the benefit of the doubt

4    on the ambiguity of these documents, and I'm operating on 10

5    to life is the range here.

6         MR. PHILLIPS:  Yes, sir.

7         And then the second issue -- and as far as that

8    issue, we understand your ruling but he also wanted to

9    continue it because of the drug amount.  And my position on

10   that, I want to know what they need more time on.  They are

11   talking about pictures that Andy Savage had -- I mean, I

12   think if the Court's going to consider that, it's been almost

13   a year, I think we should know what these ambiguous -- what

14   these amorphous issues are that need to be investigated, and

15   you know, and we can address them.  I mean, you know, I've

16   heard about these pictures.  I continue to say that Andy

17   Savage only got the pictures because the Government gave them

18   to them.  If they say there is a picture missing, the only

19   agents that have handled those, the discovery -- essentially,

20   and I would have to double-check, but either Andy Savage gave

21   him all the discovery and then we may -- or what usually

22   happens is we take the discovery that went to Mr. Savage and

23   send it to Mr. Condon, and that's what exactly went to Mr.

24   Savage.  I can tell you that my office didn't go and take out

25   pictures.  And I can talk to the agent and we can certainly

1    have him testify that he didn't take out pictures.

2              THE COURT:  Let me slow you down here.

3              Mr. Gibbs's family has every right to retain people

4    to investigate anything, and I'm the first person if there is

5    any impropriety I want to know about it, okay?  But I'm not

6    delaying this sentencing on the possibility that something

7    might be discovered.  And I want to put on the record that

8    counsel and the Court had a telephone conference the other

9    day because I was -- I had received contact that several

10   jurors had been contacted by a detective on behalf of the

11   defendant.  And, you know, they were frightened.  The

12   detective had come to their home and made direct contact.

13   And I expressed my concern that I wanted to balance the right

14   of a defendant to investigate anything regarding his

15   conviction in a reasonable way, but we didn't need to be

16   scaring and intimidating jurors.  And that the balance would

17   be, it would seem to me, would be reasonably met by the

18   detective writing a letter fully disclosing his affiliation,

19   and that the jurors have the right to not be obligated to

20   speak to him, and they could then contact him, and that sort

21   of feeling of intimidation would be lessened as a result.

22             So I -- you know, I say to the defendant and to

23   anyone who is on his behalf trying to find information, this

24   Court would be glad to entertain it and consider it at the

25   appropriate time, but I'm not going to delay sentencing today

1    on the basis of that.

2         So Mr. Condon, your motion to continue is denied and

3    I'm ready to proceed.

4         MR. CONDON:   Your Honor, can I at least have Mr.

5    Cohen proffer what he is going to do?

6         THE COURT:   I'm not sure why it affects sentencing.

7    There is a valid conviction, I need to proceed with

8    sentencing.  Anything that the detective might find or could

9    find or is looking for is something I'm glad to consider at

10   the appropriate time.  And it would -- you know, I just don't

11   know why we would be delaying that.  We have delayed this

12   thing so many times, Mr. Condon.  You tell me what he is -- I

13   want to -- I don't need to hear from him, tell me what you

14   are talking about specifically that would be relevant to the

15   sentencing.

16        MR. CONDON:   Well, he -- I guess the overall basis

17   for Mr. Cohen is to make sure that everything is looked at

18   with regard to Marcus's case to make sure that there wasn't

19   any type of misconduct and there was fairness throughout the

20   system, that there wasn't any type of juror confusion, um, or

21   any type of undue pressure put on the jury so that they feel

22   that the system was absolutely fair to Mr. Gibbs.  That's in

23   a nutshell overall.  Mr. Cohen can go into detail about all

24   of that.

25        THE COURT:   I'm -- based on what you have said, I

see no basis to continue sentencing.

Now, if in the -- you and I both know jury deliberations aren't really supposed to be a matter of discussion. If there is improper influence, contact, etcetera, that's something that this Court would want to know about immediately, and I don't begrudge the defendant from doing all within his power to investigate any potential claim he wishes to pursue.

But the -- this courthouse is open. If any information is learned that is potentially relevant, I want to hear about it, but nothing I've heard should affect the decision of the Court to proceed with sentencing today and I'm going to proceed today.

So your motion to continue is denied.

MR. CONDON: Yes, sir.

THE COURT: Okay. Now, let's swear the defendant, Ms. Ravenel.

THE CLERK: Yes, sir.

Can you come to the podium, please. Place your left hand on the Bible, raise your right.

THEREUPON:

MR. MARCUS GIBBS,

Called in these proceedings and after having been first duly sworn testifies as follows:

THE COURT: Very good. Mr. Condon, I want to

confirm that you've had a chance to review the Presentence
Report?

        MR. CONDON:  Yes, sir.

        THE COURT:  And you've had a chance to consult and
review it with Mr. Gibbs?

        MR. CONDON:  Yes, sir.

        THE COURT:  Mr. Gibbs, you, sir, have had an
opportunity to review the Presentence Report, sir?

        THE DEFENDANT:  Yes, sir.

        THE COURT:  And to consult with your attorney
regarding that?

        THE DEFENDANT:  Yes, sir.

        THE COURT:  Very good.  You can return to your seat
now.

        THE COURT:  Mr. Condon, are there objections by the
defendant to the Presentence Report?

        MR. CONDON:  Yes, sir.  We had filed a litany of
objections.

        THE COURT:  Why don't you -- sometimes they come and
go as things go, so let's just walk through them because we
are going to go through them one by one and we are going to
take our time.  We are in no rush here today.

        MR. CONDON:  The overall objection is that any
finding which increases the sentence we basically would
disagree with.  That would be any drug amounts, any

information that increases his sentence, we would disagree
with.  I outlined in that letter of March 23rd, 2012 all the
different objections.

THE COURT:  Well, let me make sure we get them
because we need to go through them.  You are saying all of
them in the letter.  We are going to walk through them.

You object to the drug amounts.

MR. CONDON:  Correct.

THE COURT:  And I take it that includes using
information outside the specific period expressly referenced
in the Indictment, correct?

MR. CONDON:  Yes, sir.

THE COURT:  And you include the use of a dangerous
weapon, the two-point enhancement for that, right?

MR. CONDON:  Yes, sir.

THE COURT:  You object to the organizer/leader
finding, correct, enhancement?

MR. CONDON:  Yes, sir.

THE COURT:  You object to obstruction of justice,
correct?

MR. CONDON:  Yes, sir.

THE COURT:  Are there others?

MR. CONDON:  I think the one with regard to the
place was weighed by probation.

THE COURT:  Yes.  And if you look at page 16 of the

1    Presentence Report, it begins on several pages going through

2    the enhancements.

3              MR. CONDON:   Paragraph 75, the --

4              THE COURT:  The dangerous weapon, we discussed that.

5              MR. CONDON:   The role adjustment, 77.

6              THE COURT:  We discussed that.  The obstruction at

7    78, we discussed that.

8              Are there any others?

9              MR. CONDON:   Well, I think what happens is that the

10   drug amount controls how the other counts are calculated and

11   so the money laundering --

12             THE COURT:  Correct.  I understand that.  But you

13   are objecting to the 38 because of the drug weights, I

14   understand.  We are going to get into that.  I just want the

15   list so when we go through we make sure we are exhausted as

16   we address your objections.

17             Are there any others?

18             MR. CONDON:   I think that covers it.

19             THE COURT:  Very good.  Okay.  And let's do them one

20   by one because I want to be careful enough about that, I

21   understand your objection, and to hear whatever you've got to

22   say and to hear from the Government one by one.

23             So why don't we do -- initially let's do any

24   objections you have to the drug weight in the Presentence

25   Report which is found to be the marijuana equivalent of

1    103,392 kilograms.  Any objections you have to drug weight,

2    what are they?

3         MR. CONDON:   Well, I think that the overall is that

4    the people that testified were -- the Court has to base its

5    finding on reliable evidence.

6         THE COURT:  I certainly do.

7         MR. CONDON:   And the people that testified in this

8    case all had an incentive to mislead the Court with regard to

9    their testimony.  They all were downward departures, all

10   looking for this time to be cut.  And I think that -- and

11   also there is drug amounts that are outside the scope of the

12   conspiracy in the Indictment.

13        THE COURT:  Anything else regarding drug weight?

14        MR. CONDON:   I think that's the general ones that I

15   covered in this -- in my memo of March 23rd.

16        THE COURT:  Okay.  Mr. Phillips, I'll be glad to

17   hear the Government's view on the drug weight issue.

18        MR. PHILLIPS:   Yes, Your Honor.

19        Well first, I believe the response by the probation

20   officer, you know, does an excellent job of dealing with that

21   objection.

22        And essentially, in reading the Sentencing

23   Memorandum, they want to limit the drug weight to what was

24   found in the truck that Mr. Gibbs was driving in the

25   Applebee's, if you recall, and they point to, well, these

1    other defendants are looking to have their time cut,

2    etcetera, and that they are therefore unreliable.

3         Well, as an initial matter, every drug case I've

4    tried in Federal Court, you have cooperating defendants, and

5    you know, whether they are reliable or not is made not by a

6    blanket assertion just because they are seeking their

7    sentence to be reduced, that they are lying.  It's a

8    credibility assessment.  The Court witnessed these

9    individuals testify, the jury saw them, and the manner, the

10   demeanor of testimony and what they testified to, and what

11   they testified to in context of the entire trial and the

12   evidence, the hard evidence that was presented, the physical

13   evidence.

14        And in assessing all of that in context, I

15   believe -- and I'll focus on three in particular were very

16   reliable, Timothy Maldonado, Pedro Ochoa -- actually four --

17   Sidney Waiters and Benjamin Jenkins.  And I'll briefly -- I'm

18   not going to retry the case -- I'll cite some things in the

19   transcript to refresh the Court's recollection.

20        THE COURT:  I've actually reread the entire

21   transcript.

22        MR. PHILLIPS:  Yes, sir, and I figured you had.  So

23   I can point you to -- and my focus is going to be Timothy

24   Maldonado and the physical evidence that shows he was

25   credible.  In addition to his demeanor, in addition to the

circumstances, how he came in to testify in the case, which
I'll remind the Court -- and I may touch on the others -- but
it sort of -- it spreads out from Maldonado in my view of the
case.

And Mr. Maldonado, if you recall, is the nephew of
Nene or Lo, who at trial we presented the evidence that he
was Mr. Gibbs's primary source of supply from Mexico, and
he's an individual that we've noted in the Sentencing
Memorandum.  And we know this not by just intelligence, but
we've had a cooperating defendant identify the Beltran Leyva
Cartel, which is associated with the Los Zetas Cartel, as the
association that Lo or Nene has.  That's the cartel that he
is involved with, that he has been offered -- and I can tell
you this -- but he has been offered to move up in the
organization and refused because the guy on top of him every
time had either been killed or arrested, and these are folks
that you would hear about on CNN and the like.  So he's a
significant drug trafficker and we established that at the
trial.

Then Mr. Maldonado was his nephew.  And what
Mr. Maldonado testified to -- and I think this is really
critical and you can use this as a starting point for the
drug weight -- Mr. Maldonado per month on the average said
every two weeks --

THE COURT:  Fourteen kilos every two weeks.

1           MR. PHILLIPS:  Yes, sir.

2           THE COURT:  Eighteen months.

3           MR. PHILLIPS:  And he said -- and I said,

4   Approximately 28 per month?  And he agreed.  And I said.

5   That went on for 24 months --

6           THE COURT:  He corrected you and said 18 months.

7           MR. PHILLIPS:  He limited it to 18 months.

8           So when you take 18 months times 28, you get well

9   over 500 kilos.

10          THE COURT:  I mean, that is, when you look at the

11  probation officer's report and the amount attributed to

12  Mr. Maldonado, it is the overwhelming, over 90 percent of the

13  drug weight at issue in this sentencing.

14          MR. PHILLIPS:  Yes, sir.

15          THE COURT:  It's all -- that's why I went back and

16  reread Mr. Maldonado all by himself because I realized the

17  significant impact it has.

18          And I will say just for the record -- of course I

19  tried this case, I found Mr. Maldonado's testimony very

20  credible.

21          MR. PHILLIPS:  Yes, sir.

22          THE COURT:  And as obviously did the jury.

23          MR. PHILLIPS:  Yes, sir.

24          And there is -- and not only in his demeanor and the

25  way he testified, but there is physical evidence that

1    corroborated this number.  And it's almost -- it's almost --

2    it's shocking in a way of how it's corroborated, how

3    strongly.  And I've had a lot of cases in my time as a

4    prosecutor and I've not had a case like this where there was

5    so much evidence that fit together so well.

6         He says 14.  I can tell the Court that Mr. Maldonado

7    never saw -- he wasn't part of this case, he never got the

8    discovery.  Yeah, I can't say he never saw the discovery, he

9    was in Kentucky in the Bureau of Prisons, I don't have any --

10   we never gave him discovery, we never showed him discovery.

11   So I think it's safe to say that he didn't see the discovery.

12   And for him to say 14, it's -- the irony there is what does

13   the text message say from Mr. Gibbs's phone to Nene.

14        THE COURT:  Fourteen girls.

15        MR. PHILLIPS:   It orders 14 girls and there was

16   testimony that was cocaine.

17        So right there, with some testimony he's explaining

18   what girls were, there is corroboration, that this number

19   isn't something that he pulled out of thin air, that it's

20   consistent with what the physical evidence shows, the text

21   from Mr. Gibbs to Nene.

22        In addition, beyond that you have what was seized

23   from Woodbridge in Johns Island, and it's 12 kilos.  Now,

24   it's not 14, but it's 12 kilos, a significant amount.  It's

25   very close to 14.  But in preparing for this -- and I don't

think I made this point at trial, but it's certainly, I could
have made it, I did talk a lot about the wrapping of the
kilos in the truck at Applebee's.  I made a lot of argument
with the jury about the wrapping and comparing -- in
closing -- in comparing the wrapping of the kilos found in
Woodbridge and the wrapping of the kilos that were found in
the truck, and they were identical.

Now, I don't recall how many kilo wrappers were in
the truck, it was more than one.  So if it was two, three,
four, that's a number that is almost identical or similar to.

THE COURT:  It had been an ongoing trafficking
organization.  It doesn't mean that Mr. Gibbs would exhaust
his entire supply before another one would show up.  So the
fact that it is exactly 14 or less, slightly less, it seems
to me not a big moment to spend time with.

MR. PHILLIPS:  Well, I'm just pointing out that
it's consistent, that corroborates Mr. Maldonado's
recollection of how much drugs he was getting.  That he was
ordering up 14, approximately 14 every time, and then you
have physical evidence of the text message and you have
physical evidence of drugs seized and wrappers seized that
are all consistent.  We are not talking about finding a kilo
at his house and that's it, and someone saying he's buying 30
kilos, we are talking about 14.  And we are all in the same
universe.  That's my point, that that corroborates

Mr. Maldonado.

And then from there, you know, his number, when you hear Benjamin Jenkins, is very similar. And Mr. Jenkins was a little earlier, but they were dealing with the same folks and they were dealing with the same volume. He and Gators, you may recall the testimony involving Gators, they are a gang from Benjamin Jenkins and Mr. Gibbs. They were all sort of starting out together with this Mexican source and going to the same time.

So that -- again, Mr. Maldonado's testimony, the physical evidence I think corroborates -- corroborates Mr. Maldonado, as well. And again, he's credible, too, I believe because, you know, the gun, Mr. Gibbs can't really deny that he doesn't know who Mr. Maldonado is because he's got a gun that is registered to his house. Mr. Maldonado explained that. And Mr. Maldonado on top of that recognized the phone number that was out in the safe.

THE COURT: Yeah. Let's just put on the record that the phone -- a number in the defendant's home safe in his bedroom was the head of the cartel's home phone number.

MR. PHILLIPS: Yes, sir. It was Lo or Nene's, he goes by both names, home phone number.

So when you take all of that, you can't just ignore their testimony, and it's completely valid to consider that -- and the point I make in the Sentencing Memorandum for

1   a different issue is if you cut it in half, it's still

2   double --

3               THE COURT:  Three times.

4               MR. PHILLIPS:   It's still double -- I mean, it's

5   more than -- he would have to get below 150 to get to below

6   that offense level where he would get 360 to life, the

7   enhancements are another issue.

8               So when you consider all of that, it's absolutely

9   appropriate, and I argue the Court should attribute that

10  weight to Mr. Gibbs for all those reasons and the reasons

11  apparent in the transcript of the trial.

12              THE COURT:  Well, what about the argument about not

13  being within the time alleged in the conspiracy?

14              MR. PHILLIPS:   Well, Maldonado I believe is.

15              THE COURT:  What it actually says, "at least in and

16  around January 2007."

17              MR. PHILLIPS:   Yes, sir.  And that's a point we

18  always make.  And we always notice these things in 404(b) to

19  be safe, but a conspiracy under -- the case law I believe

20  supports this -- we are not bound to that date as a drop dead

21  date.  I mean --

22              THE COURT:   And we also have the relevant conduct

23  concept under sentencing that if -- particularly if we have

24  the same course of conduct, the Court can consider that in

25  terms of evaluating an appropriate sentence.  So we have that

issue as well.  And this seems to me to be classic, same
source of drugs, etcetera, same course of trade,
international drug trafficking, I mean, it just, you know,
with the same source seems to be classic, you know, same
course of conduct.  So --

     MR. PHILLIPS:  Yes, sir.  Because as you recall,
Benjamin Jenkins shed light on the fact that they gave,
Jenkins and Mr. Gibbs, they all were dealing with the same
guy and when they were arrested and taken off, and Gibbs
continued.  And so you can't tell the story of the 14 kilos
and all this other stuff without the beginning of the story.

     And so it's -- I think it's appropriate under
relevant conduct.  And with the leeway we are given with our
indicting, and he certainly was on notice -- and we are not
talking about 10 years prior, we are talking about a few
months to a few years prior.

     THE COURT:  Well, Mr. Maldonado's is just 2006.

     MR. PHILLIPS:  Yes, sir.

     THE COURT:  And he's describing, you know, covering
the period into 2007 and --

     MR. PHILLIPS:  Yes, sir.

     THE COURT:  -- and thereafter, so --

     MR. PHILLIPS:  Squarely within it.

     THE COURT:  Squarely within it.

     MR. PHILLIPS:  And the only other thing I would

point out, I mean in their objections he tries to distance
himself again from Woodbridge Drive, but for all the reasons
that -- you reread the transcript -- so for all the reasons
we argue, I think that that's a nonstarter, that that --

THE COURT:  We've got the GPS testimony and other
things.  I just, you know, the jury had the case.

MR. PHILLIPS:   Yes, sir.

THE COURT:  I just feel on the issue of drug
weights, I overrule the objection of the defendant.  I think
there is clearly a preponderance of the evidence.  Frankly, I
believe it's beyond a reasonable doubt that the drug weights
exceeded significantly the amounts which would make a 38
appropriate, and so I deny that objection.

Let's proceed to the next one, which is the gun
enhancement.

I'll be glad to hear from you, Mr. Condon, relating
to the gun.

MR. CONDON:   Thank you, Your Honor.

Your Honor, just on that last issue of drug weight,
um, I would like to make a comment that if there was that
much weight going back and forth between Charleston and
Atlanta, you know, where is the money?  I mean, we are
talking about over a million dollars just from, we are
talking about Maldonado.  I mean, well over a million
dollars.  And so -- I mean, if he's a big, huge drug dealer,

1    you know, where is the funds?  Where is the amenities that go

2    with that kind of lifestyle?  I'm just saying --

3        THE COURT:  The Government might ask the same

4    question to the defendant.  I don't know.  That's not --

5    that's not the issue.  The issue is:  Is there evidence that

6    he was engaged in drug trafficking?  And there is tremendous

7    evidence of that and I deny that objection.

8        But let's proceed to the gun enhancement.  Let me

9    hear -- what you got to say about that?

10       MR. CONDON:  First of all, you know, Mr. Gibbs was

11   acquitted of that 924(c) charge.

12       THE COURT:  But Mr. Condon, I will say that, you

13   know, I'm fully aware of the case law that says that the

14   standard for sentencing is beyond -- is preponderance, and of

15   course for a criminal conviction is beyond a reasonable

16   doubt.

17       But for purposes of this sentencing let's just focus

18   on the other gun.  I mean, he was acquitted of this charge,

19   and I just frankly would rather focus on the other gun.  So

20   if -- I'm going to find the enhancement, I'm going to base it

21   on the FNH weapon and not the one at the Applebee's.  So

22   let's just proceed to that one.

23       MR. CONDON:  Okay.  And we are talking about the

24   situation at Applebee's.

25       THE COURT:  I'm not -- I'm not going to -- I'm not

1    going to use that as a gun enhancement for the gun.  So I

2    want to focus on the one -- the weapon that had been owned by

3    Timothy Maldonado, had been sold and was at the house, found

4    at the house pursuant to the search warrant.

5         Mr. Phillips, am I right about that, that gun was

6    found at the house?

7         MR. PHILLIPS:  Yes, sir.

8         THE COURT:  And on Woodbridge Drive.

9         MR. CONDON:  Obviously the first thing is that

10   the -- Woodbridge is being linked to Mrs. Nelson.  The lease

11   was in her name.  There is no actual possession, so you have

12   to basically go on constructive possession.  And there is no

13   evidence that he had dominion and control over that weapon in

14   connection with any drug activity.  There is no connection

15   between what was found at Woodbridge and a gun.

16        THE COURT:  Anything else?

17        MR. CONDON:  Um, no, sir.

18        THE COURT:  Mr. Phillips?

19        MR. PHILLIPS:  I'll try to be brief, Your Honor,

20   it's not my strong suit, but just for the record --

21        THE COURT:  I noticed, though, that when you go

22   through -- after a while, people get briefer as the

23   objections get longer, you know, people's enthusiasm fades.

24        MR. PHILLIPS:  Yes, sir.

25        Just for the record, I'm not going to argue it, but

just for the record, we don't concede that the gun in the
trunk shouldn't -- we think it should be considered, we
understand your ruling, but we would argue it should be
considered based on the variance standards and based on the
fact that it's -- the enhancement doesn't have quite the same
elements either.  I mean, a 924(c) sort of has a lot more
moving parts than the Guideline enhancement.

THE COURT:  I fully agree with that.  I just think
it's sort of like a materiality, it doesn't really matter if
the FNH weapon is in his possession at the place where we are
transacting drugs.  It doesn't really matter.  We need to get
to the other one, as well.

MR. PHILLIPS:  And I understand, I just want to
preserve --

THE COURT:  You are preserved.  And I'm not really
ruling on it, I just don't think it's necessary to get to it.

MR. PHILLIPS:  As far as the FNH he said there is
no evidence of dominion or control.  Well, there is, because
again, we've already -- you've already said that you found
Mr. Maldonado credible.

THE COURT:  He sold it to him.  He paid $2,000 for
the weapon, it was his weapon.

MR. PHILLIPS:  It was registered to him.  I mean,
that's not something we made up.

THE COURT:  And we have the GPS evidence that placed

the defendant repeatedly at this residence during the

relevant period of time and the weapon is there.  And we know

we've got ledger -- drug ledgers there, we've got money

counting machines, we've got weighting, we've got 12 kilos of

cocaine, I mean, it just seems like a lot there with that gun

there.

MR. PHILLIPS:  That's our essential argument.  And

he had other drugs that were seized, that were taken out of

the house that night, as well.

So when you -- when you look at the requirement --

essentially, the adjustment should be applied if the weapon

was present unless it's clearly improbable that the weapon

was connected with the offense.  I don't see how when you buy

it from your source --

THE COURT:  A drug --

MR. PHILLIPS:  -- source nephew, and you have in

your house 12 kilos, which -- how much is 12 kilos?  $360,000

for the drugs, something that other people might want to take

from you with another gun somewhere else, it's a hard road to

travel to get to a place where the Court can make a finding

that's clearly improbable that that weapon was not connected

with a drug offense.  And we argue on that basis that the

enhancement should apply.

THE COURT:  Well obviously you are citing *U.S. vs.*

*McAllister's* principle there on the issue of clearly

1    improbable.

2              Mr. Condon, I'm glad to hear anything else that you

3    have to add on that, sir.

4              MR. CONDON:   First of all, Your Honor, there is no

5    fingerprints that show that he had touched that gun.

6              And also -- I mean, I think you have to go on not

7    just -- you can't just speculate that the gun, you know,

8    belonged to him at that time.  I think that you have to have

9    more than just -- and I think that's what it is, just mere

10   speculation that the gun is --

11             THE COURT:  Now Mr. Condon, how do you reach that

12   when the uncontested evidence is he purchased it for $2,000

13   from a drug dealer?  I mean, he purchased it.  It's at the

14   place where he is spending most of his time, where there is

15   huge drug trafficking.  I mean, I just think that one has to

16   sort of suspend common sense to say that it's speculative.  I

17   don't think it's speculative at all.

18             MR. CONDON:   Your Honor, the thing is you don't

19   know what happened between the -- when the gun was purchased

20   and when it was found at Woodbridge.  It's mere speculation

21   that he had custody and control over that weapon when the

22   search warrant was executed at Woodbridge.

23             THE COURT:  Anything further?

24             MR. CONDON:   No, sir.

25             THE COURT:  I do find that the enhancement for a

dangerous weapon is appropriate here.  It was present.  The

Sentencing Commission talks about the danger associated with

guns and drugs and has appropriately applied an enhancement

associated when they are present.  This was an area which the

drug trafficking, this Woodbridge Drive area, I think the

evidence is overwhelming that the gun was present, and it's

not clearly improbable to this Court that it was related.

And I think Mr. Gibbs had it for the very reason the

Government said, to protect himself because he was involved

in a very dangerous enterprise in which people might seek to

take it or which he might need to use it in furtherance of

his drug trafficking business.

So I deny that objection.

MR. CONDON:  Your Honor, just for the record, I

would just note that, you know, the issue with regard to the

residence being used as a place where drugs are being used or

carried on, you know, obviously was weighed by Probation.

THE COURT:  That is not an enhancement.  You are

raising the question whether he was there.  And I'm saying

the evidence in the record is that he was there regularly,

constantly during this period of time, that drugs were

present there, that he had his drug ledger there, that he had

money counting machines there and he had the gun there.  Now,

you know, that's just -- there is just no contest in the

record on any of that.

1        And I find with regard to the gun enhancement,

2    that's the only issue I'm dealing with, that the defendant's

3    objection is overruled.

4        Now, how about the issue of organizer or leader?

5        MR. CONDON:   Pardon me, Your Honor?

6        THE COURT:  The issue of organizer.  You objected to

7    the four-point enhancement of designating Mr. Gibbs as an

8    organizer or leader.

9        MR. CONDON:   I think the main issue on that is that

10    whether the person has control over someone else.  I don't

11    think there is any evidence that Mr. Gibbs controlled

12    anybody.  And so in that situation which, you know, there

13    wasn't any evidence that he, in fact, controlled anybody for

14    that enhancement to be applied.

15        THE COURT:  Okay.  Anything further?

16        MR. CONDON:   Just, you know, what's stated in our

17    memo, Your Honor, of March 23rd.

18        THE COURT:  Thank you.

19        Mr. Phillips?

20        MR. PHILLIPS:   Your Honor, there is significant

21    evidence that he was in control.  And when you look at the

22    standard, it's not --

23        THE COURT:  Control is not the only issue.

24        MR. PHILLIPS:   It's not the only issue.  And again,

25    Probation covered this as well or better than I could, so I

1    won't belabor their points, I adopt their points.  But

2    looking at the evidence, this is what I'll point to.  He was

3    clearly in control at Applebee's.  He was -- you had

4    evidence -- Waiters gives you a window into what's going on,

5    and he's in charge.  He's the source of supply.  He's in

6    charge at Applebee's.

7         Then you have the ledger sheets where "Yack" is on

8    there as one name, and you heard testimony that Tremayne Ford

9    who is a codefendant in this case, his nickname is "Yack,"

10   you had, you know, Green and the numbers and testimony from

11   Officer Laird that those are all consistent with drug --

12        THE COURT:  And the ledger had him fronting money,

13   which is another element to consider.

14        MR. PHILLIPS:   Yes, sir.

15        So when you take all that in consideration -- you

16   also had the testimony of how the drugs transported back and

17   forth.  It wasn't just Mr. Gibbs solely going, he would

18   deliver money and then someone -- there was occasion where

19   someone else would take the drugs back, which is common.  So

20   when you take all that, you clearly have all of the elements,

21   as outlined by the probation officer, were met by the

22   evidence and that would be the argument the enhancement

23   should apply.

24        THE COURT:  Yes.

25        MR. CONDON:   I think you have to be very specific

with regard to the number of people.  I mean, there is no

evidence that -- you know, the enhancement talks about --

THE COURT:  Five or more.  Are you talking about --

I'm sorry, the enhancement talks about --

MR. CONDON:   Five or more people.

THE COURT:  Yes.  Look at the ledger sheet, 12, 14

names on that ledger sheet alone, you've got all the people

he's interacting with in Mexico.

You know, Mr. Condon, what we have here is, the

evidence is, that Mr. Gibbs was a major organizer and leader

of an international drug trafficking operation sourced from

Mexico, transferred through Atlanta, that were bringing very

large amounts of illicit drugs into the Charleston area.  He

coordinated shipments, according the testimony.  He

communicated regularly with Mr. Maldonado.  I believe

Mr. Maldonado's testimony was they sometimes spoke every day.

He had -- he contacted -- had communication with the head of

the cartel, Nene, also known as Lo.  He distributed it to

local dealers, we know that through the ledger sheet.  He

fronted drugs to some of these, we see that on the ledger

sheet.  He exercised decision-making authority.  He planned

and organized.

I mean, I -- I think it's really clear and so I

overrule the defendant's objection seeking not to have him

designated as an organizer or a leader.  I believe it

satisfies the Guidelines requirements.

How about obstruction?

MR. PHILLIPS:  Your Honor, can I just clarify a statement that I made?  I think I said something in error, and I don't want any issue.

THE COURT:  Yes, sir.

MR. PHILLIPS:  I don't think it changes anything, but I said Mr. Maldonado -- I think I confused witnesses, I'll retract the statement -- I said that -- I may have indicated that he talked about other people taking the drugs back, but I looked back at his testimony and he specifically didn't know one way or the other.  So I don't want -- I don't think you considered that, but --

THE COURT:  I did not.  I've read his testimony. I'm relying on my own recollection and my review of the record.

Let's talk about obstruction.  You have made an objection about the two points for obstruction.

MR. CONDON:  Yes, sir.  Your Honor, my client wanted to address the Court.  I didn't know whether --

THE COURT:  I would be delighted -- if he wishes to speak, I would be delighted to hear from him.

MR. CONDON:  Okay.  I mean, that's up --

THE COURT:  And let me just say this, Mr. Gibbs, I'm going to give you a chance at any point to speak, but if you

1    want to speak now, I will allow you to do it.  When we finish

2    with these objections, we are going to get into the

3    sentencing issues, and I would very much -- it's up to you,

4    sir -- I would love to hear from you then, but if there is

5    something you would like to say now, I'll be glad to hear

6    from you, sir.

7         Why don't you come to the podium with him, Mr.

8    Condon?

9         MR. CONDON:  Your Honor, obviously it's Mr. Gibbs's

10   decision to do this.

11        THE COURT:  He can do this.  And Mr. Gibbs, you are

12   asking to speak to the Court, correct?

13        THE DEFENDANT:  Yeah.

14        THE COURT:  And I'm delighted to hear from you, sir.

15        THE DEFENDANT:  I just wanted to go on record to say

16   that I'm going to go on with the sentencing part, and I don't

17   want Mr. Condon to represent me no more.

18        THE COURT:  Well, he's representing you now and he's

19   been representing you throughout the trial.  Are you saying

20   that after the sentencing is over, you don't wish to --

21        THE DEFENDANT:  No, right now.  I don't want him to

22   represent me no more.

23        THE COURT:  Well, that's --

24        THE DEFENDANT:  And I think that's my right that I

25   can concede to him representing me.

1          THE COURT:  Well, you have a right to represent

2     yourself, but I need to bring -- let me finish and --

3          THE DEFENDANT:  All right.

4          THE COURT:  I will allow you to do this.  I'll hear

5     from you and I'll be glad to hear from anyone else here.

6          Obviously these issues are very technical.  There

7     are a lot of court cases, there is Sentencing Guidelines

8     rules, there are other issues that are -- that a lawyer

9     brings to the table, benefits to the client that are very

10    important.  And there is great risk when you don't have that

11    background to try to represent yourself.

12         THE DEFENDANT:  No, um --

13         THE COURT:  But --

14         THE DEFENDANT:  I'm going to let you -- no

15    disrespect, Your Honor -- I'm going to let you do what you've

16    got to do, but I'm going to get another representation.  Me

17    and my family have pulled together with some other people, we

18    are going to get me another representation.

19         THE COURT:  Well, you have a right to do that.  Of

20    course you've -- Mr. Condon has represented you throughout

21    the trial and he's represented you in this sentencing.  And

22    in my own opinion, he's done a very able job.  But you are

23    the client, not me, okay?  So it's your right under the Sixth

24    Amendment to represent yourself.  And if you tell me that,

25    not withstanding the warning I've given you, that I think

1    it's not in your interests to terminate him at this point,

2    and that you wish to represent yourself for the balance, I

3    will let you do that.  I just don't think that's a good idea

4    for you, sir.

5              THE DEFENDANT:  Yeah.  I'm not representing myself,

6    he's not representing me, I'm just going to concede to the

7    Court.  Y'all are going to do what y'all are going to do and

8    I'm going to hire another lawyer.

9              THE COURT:  The problem is, of course, we are

10   proceeding with sentencing right now, and I'm not going to

11   stop the sentencing, and I think you are served --

12             THE DEFENDANT:  I understand that.

13             THE COURT:  -- and you are served obviously by

14   Mr. Condon continuing to represent you here.  If -- and I

15   think it will be to your benefit to have him represent you

16   here.  If after this hearing is over you wish to retain other

17   counsel, of course that's your right to do that.

18             I will also afford you the right, if you tell me you

19   want Mr. Condon not to represent you anymore, not

20   withstanding the fact that I've warned you about the risk

21   associated with that, I will allow you to continue to proceed

22   representing yourself.  I don't think that's in your

23   interests to do that and I'm trying to encourage you not to

24   do that, but you have the right to assert that.

25             So I would -- if you want to think about it a

moment -- but my own recommendation to you is that you allow

him to continue representing you through this, but if you

tell me you don't want him to, I will allow you to represent

yourself.

THE DEFENDANT:  That's what -- I'm not letting him

represent me.  This is something that was supposed to be said

from the beginning.  This is not -- he's not going to

represent me, and y'all go ahead and do what y'all are going

to do.  And that's my -- I think that's my right right there.

THE COURT:  You are -- are you terminating

Mr. Condon as your attorney?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  You do not wish to have him

represent you any further?

THE DEFENDANT:  Yes, sir.

THE COURT:  Well, do you wish to represent yourself

now?

THE DEFENDANT:  No, sir.  But I'm going to let y'all

go ahead and do what y'all got to do.

THE COURT:  We can't -- you either -- I can't allow

you -- you have a right to represent yourself, but you are --

if you wish -- if you terminate your lawyer, you need to

represent yourself.

Now, if you elect in representing yourself not to do

anything, that's your business, Mr. Gibbs.  I'll be honest

1    with you, sir, I don't think this is in your interests to do

2    this.  I think there are important issues to be addressed

3    here in sentencing and I think you need the assistance of

4    Mr. Condon to do that for you, but I will allow you to

5    represent yourself if that's what you wish to do.

6         THE DEFENDANT:  Yeah.  I'm going with -- he's not

7    representing me and I'm not representing me.  Just go ahead

8    to your sentencing.

9         THE COURT:  Mr. Gibbs, why don't you -- this

10   gentleman wants to speak to you a second.  Why don't you step

11   back there and talk to him.

12        (Pause in proceedings.)

13        THE DEFENDANT:  Um, they want to have a recess for

14   me and my family real quick if you don't mind.

15        THE COURT:  I'm glad to have a recess.  Very good.

16   We'll take a brief recess.

17        (Thereupon, there was a brief recess.)

18        THE COURT:  Mr. Gibbs, you've had a chance to

19   consult with your family.  We are going to go back on the

20   record.

21        Mr. Gibbs, if you could come to the podium, please,

22   sir.

23        MR. PHILLIPS:  Judge, can I interject?  Just from

24   our perspective, this is ultimately his decision the way he

25   wants to go, but I just wanted to frame the issue as we see

1    it, which might help and it may not.

2            THE COURT:  I'm glad to.  I'm getting ready to make

3    an inquiry under *U.S. Vs. Mullen* regarding the basis of his

4    request here, but I want to give him a chance to -- give him

5    a chance to speak to his family.

6            Mr. Gibbs, having consulted with your family, do

7    you -- are you -- what is your thinking concerning

8    Mr. Condon's representation?

9            THE DEFENDANT:  Um, they want him to represent me.

10           THE COURT:  I'm sorry?

11           THE DEFENDANT:  They want him to represent me.

12           THE COURT:  You know, this is not a decision for the

13   Court or for your family, this is your decision, sir.  And

14   the -- so you need to tell me, do you want Mr. Condon to

15   represent you?  Having received the advice of your family and

16   considered it, do you want Mr. Condon to continue your

17   representation?

18           THE DEFENDANT:  My family want him to represent me.

19   I don't care.

20           THE COURT:  Well, that's not a good enough answer.

21   You need to tell me -- I know you've consulted with your

22   family, you obviously -- I watched you, you obviously have

23   respect for your family, they have respect for you, but you

24   need to make the decision.  Based upon the advice you've

25   received from the family and from your own consideration of

this matter, do you wish to have Mr. Condon continue to represent you? That's a simple yes or no answer.

THE DEFENDANT: I am trying to get past that. That's just one of them questions that I try to really concentrate, I trying to pray on that right there. I just -- I ain't getting no reply here, I'm just praying on this one right here.

THE COURT: Well, tell me, if you would, what is your basis for wanting to replace Mr. Condon?

THE DEFENDANT: I don't think he did the best job. I don't think he did the best job. Like for instance, on the closing, he spent three minutes; Mr. Phillips spent four hours, you know. On direct -- um, cross-examination of the witnesses, it was like, you know, lopsided. He catch a panic attack in the middle of the case one time. And evidence was moving around, we don't know where the evidence gone at. When the prosecutor take 160 something evidence up and we only put up 410, and some of our evidence got missing. It's like things that I -- I saw that I was speaking up, but it never got -- it never got brought up. It never got -- I don't feel like I got a fair trial and I don't feel that he represented me a fair way. It was like things that went wrong. It was bad -- bad questions that wasn't answered. It was bad -- for instance, the police said he was 500 to 600 yards away watching the house. If he was 500 to 600 yards

away, there is no possible way to be 500 or 600 away to see the house without binoculars. He didn't have no binoculars, all this stuff he didn't jump on. Just like you reread your transcript, I reread my transcript and there is a lot of things that -- you are a judge and I ask you to be honest on your -- if you -- you was a lawyer one time before, right?

THE COURT: I was, sir.

THE DEFENDANT: And was bad things that you would pick up in that case that you would have asked in cross-examination that you would pick up on the lies and stuff that they told.

THE COURT: Is there anything about the sentencing, the way Mr. Condon is handling your sentencing hearing, that you are unhappy --

THE DEFENDANT: It's like the same thing going on into the -- from the trial to the sentencing, the same thing going on from the trial to the sentencing.

THE COURT: Specifically what are you speaking of?

THE DEFENDANT: Like it's -- he don't got it together. He coming up short with everything. He's trying to find things -- he's a good man. He's a spiritual man and my spirit love him, but I've got nine kids, three grandkids, I'm trying to fight for my life right here, Judge. He's not -- he's -- I just need you to be honest with the Court for a minute. Are you a God fearing man?

1             THE COURT:  You don't get to question the Judge.

2             THE DEFENDANT:  But I mean, it's some -- it could

3    have been represented better.

4             THE COURT:  Well, is there -- has he met with -- was

5    Mr. Condon meeting with you and communicating with you?

6             THE DEFENDANT:  Not as much as I want.  And when he

7    did come, it was in a booth.  And they got a lot of rooms

8    that we can go into and write papers in and sit down, not a

9    glass, not a glass booth.

10            And it's like he -- I believe in my heart that he

11   did the best that he could do, but it was too much for him.

12   We had a lawyer, the lawyer ran off with our money, Andy

13   Savage, and left us Condon.  Condon leave me but one case and

14   then they combined the cases at the last minute, so

15   Mr. Condon was on the outs.  He didn't have the proper help.

16   He didn't have all the things that he needed to represent me

17   in my best interests.  He didn't have it.

18            THE COURT:  But did he -- you can talk to him, you

19   communicate with him?

20            THE DEFENDANT:  Um, I called his office.

21            THE COURT:  I'm talking about when you meet with

22   him, y'all were able to communicate with each other?

23            THE DEFENDANT:  We -- we couldn't communicate all

24   the way because we was -- he keep -- when he keep coming they

25   keep putting him in a glass.  And when we are talking it was

like we can't show each other everything.  If I'm sitting
right beside you, Your Honor, I can show you things.  I can
show you -- talk to you better, not through a glass where you
are not getting everything that I'm saying and I'm not
getting everything that you are saying, I'm not seeing
everything.

And when everything came down to the -- to it and
everything, it's like truthfully he asked questions that I
wouldn't ask, but I have questions that he didn't ask.  It
was like, how could this man go from Applebee's all the way
to the Bank of America, say, um, put up drugs and be back on
Johns Island in 20 minutes when it going take you over 20
minutes to get there?  It's going to take 20 minutes to get
to the Bank of America on Remount.  These are the things that
he didn't ask.  He didn't give the jury a time to have doubt.
Your Honor, he just got up and asked some of the questions
and that's it.  And then there was two prosecutors against
one, and I think that was unfair.  Two prosecutors against
one lawyer, that's like really unfair.

So I think through the whole thing I didn't get a
fair shake.  We -- we asked for Maldonado's border record
because he was on -- he said he was down in Mexico and when
he came back, when them had an argument, and he came back and
then he got caught with drugs and going in Kentucky and got
locked up.  So how long did he been in Mexico?  When did he

been in Mexico?  When he was telling that prosecutor that he
was here, how we know that he wasn't in Mexico?  Why can't we
get his border patrol -- border records?  He had a border
pass, didn't he?  He stated that.  He said he was a citizen.
Was he sneaking over to Mexico and sneaking back?  These are
the things that he could ask and the jury would have been
like, yeah, you know...

THE COURT:  Well, at this point -- I've made an
inquiry here and I don't see a basis -- there does not appear
to be a total lack of communication between counsel and the
defendant.  He does have concerns which he says were from the
trial, and he also seems unhappy with the way the
presentation is being made.  The Court observed Mr. Condon
both at the trial and here, and of course I've read his
briefs, and Mr. Gibbs, I respectfully disagree with you.  I
think he is able to represent you.  It's a difficult
situation.  Some of these issues are very hard.  He's doing
his best with a difficult set of facts.

I also find that the timeliness of this issue, I'm
considering under *U.S. vs. Mullen*, raising it at the
sentencing hearing is way too late in the process,
particularly about matters that happened at trial.  Of
course, Mr. Gibbs, you will have a right to appeal.  You will
have a right to seek post conviction relief.  You will have a
right to raise ineffective assistance of counsel issues.  So

none of these issues are foreclosed from you subsequently

raising.  I, of course, observed the trial, if I had a

concern that you were not receiving competent counsel, I

would have addressed it right then and there.  I would not

have sat there --

          THE DEFENDANT:  Wait a minute, Your Honor.

          THE COURT:  -- and accepted that.

          THE DEFENDANT:  Do you remember at the end of the

trial he didn't ask for -- what was that for, that you had

to -- a 2253 something?  He didn't ask for this and the

prosecutor had to ask him, Joe, you've got to ask for this.

When the prosecutor started to have to ask you and help you

with your case, then something is wrong.  I don't know -- at

the -- the suppression hearing, the prosecutor had to tell

him, well, he didn't turn in no paperworks with case law.  He

didn't -- he told you about the wall stuff, but he didn't

have no case law to back it up, the prosecutor had to brought

that up.  These are the things that the prosecutor brought up

and said, Well, Joe, you don't have no cases to back these

up.  How could you see somebody representing me with all

these folders when they don't have cases to back me up?   I

mean, and he's arguing, no, that they've got to have cases to

back it up.

          I love Mr. Condon with all my heart.  He's a good

man, he's a spiritual man, but I would rather just go ahead

1    and -- there is a saying, um, you might as well just lie down

2    and play dead if you are going to lie with the fleas.

3         THE COURT:  Well, the first issue I need to address

4    is whether I'm going to allow you at this late date to

5    substitute counsel.  And under the standards of *U.S. vs.*

6    *Mullen* I deny that motion.

7         Now, we are back at the point where we were, which

8    is, do you wish Mr. Condon to represent you or are you going

9    to represent yourself?  My strong advice to you is not to

10   represent yourself, to have Mr. Condon represent you.  I take

11   it from what you share with me that your family has urged you

12   to do the same thing.  But in the end, you have to make the

13   decision whether you wish to have Mr. Condon represent you.

14        I will tell you that when we finish these

15   objections, we then need to deal with sentencing.  And one of

16   the issues is whether a variance is appropriate because the

17   Guidelines, unless we have some change here, is life.  And I

18   have the discretion to go below that.  And I had the lawyers

19   brief the issue of a variance.  Mr. Condon filed a very able

20   brief on your behalf, Mr. Gibbs.

21        THE DEFENDANT:  Yes, he do.  He filed some good

22   paperwork, it's just --

23        THE COURT:  And I -- and I wanted to hear from him

24   and you on that issue.  It's a very important issue for you,

25   sir, and I think you will be more ably represented to have

1    him assisting you, but I can't make you do that.  You have

2    correctly stated that if you wish to represent yourself, I

3    must allow you to do that.  I can give you all the advice to

4    the contrary, but in the end, just like your family can, your

5    family can give you the best advice they can, but in the end

6    you have to agree to have Mr. Condon represent you.  And if

7    you tell me that you want to represent yourself, I'm not

8    going to stop you.  I just -- it will be against the advice

9    of the Court and obviously of your family, but that's your

10   decision.

11              THE DEFENDANT:  Your Honor, I love my family.  He

12   represent me.

13              THE COURT:  Very good.  If you will retake your seat

14   then.

15              We were at the issue of obstruction, Mr. Condon, and

16   we were going to address the issue of the Government's -- of

17   the defendant's objection to the two points for obstruction.

18              And as I understand it, Mr. Condon, there are two

19   issues, one of them is in the Presentence Report regarding

20   communications via an attorney to Sidney Waiters and then

21   there is this issue of an alleged statement between Mr. Ochoa

22   and the defendant.

23              Am I correct about that?

24              MR. CONDON:   Yes, sir.

25              Obviously he didn't have any control over any

1    attorney, you know, having contact with Sidney Waiters,

2    that's strictly the attorney's decision to do that.

3            In terms of -- I don't think there was any

4    threatening or intimidation with regard to Sidney Waiters and

5    it was just an understanding of --

6            THE COURT:  It's your suggestion that the attorney

7    went there by himself and on his own initiative and not on

8    behalf of his client to persuade him to what would have been

9    perjurious testimony?

10           MR. CONDON:  Well, I think the -- I mean, I

11   wouldn't necessarily put it that way.  I think he was just

12   trying to --

13           THE COURT:  Why would the attorney do that?  Why

14   would the attorney do it on his own?

15           MR. CONDON:  Well, I think he's trying to sort out

16   a complicated situation and see if Mr. Waiters could take

17   responsibility for what he did, and I think that's what he

18   was trying to sort out.

19           And then the other thing is with regard to Pedro

20   Ochoa, obviously Mr. Ochoa testified there wasn't any

21   intimidation or threat with regard to that; it was strictly a

22   comment.

23           THE COURT:  It was, I'm sorry, what?

24           MR. CONDON:  It was strictly a comment that, you

25   know, to Ochoa about testifying at trial.  And so I don't

think there is any type of threat or intimidation with regard
to that.

The other issue is with regard to, you know,
Mr. Waiters, that's strictly trying to sort out basically
responsibility for what happened.  I don't think there was
any type of -- type of goal, you know, to commit perjury or
cause somebody to commit perjury.

THE COURT:  Okay.  Mr. Phillips, what's your
thoughts about this?

MR. PHILLIPS:  Your Honor, regarding Mr. Waiters,
what Mr. Condon ignores is Mr. Waiters's testimony on direct
examination, the copy I have early on in the case, I
requested specific witnesses, and then I know we now have the
full volume, so my page is 27, but I'm sure there it is a
different page.  But I can tell you -- I'll read the
testimony into the record, it's very short.

Mr. Bianchi asks whether Mr. Waiters and Mr. Gibbs
had a conversation about what had happened at Applebee's.

"Did you have a conversation with the defendant
prior to being booked in at the jail?"

Waiters answers:  "On the way to the jail."

"Question.  From where?"

Answer by Mr. Waiters:  "From the Nation's Bank to
the county jail.

Question.  And tell us about that conversation, what

1    happened?"

2          Answer by Mr. Waiters:  "Conversation was he

3    accepted the gun charge, I accept the coke charge and he'll

4    pay my attorney and everything and give me ten grand to take

5    the charge."

6          "Whose idea was that?"

7          "That was his idea."

8          "So this was him asking him to do that?"

9          "Yes, sir."

10    THE COURT:  That's not the lawyer relaying that.

11    MR. PHILLIPS:   This is Mr. Gibbs.  So this is

12    direct testimony -- and it goes on, you can find that in

13    the -- it's in the transcript, it goes on, there is more

14    details.

15          So we are not speculating -- first of all, there is

16    a conversation -- there is testimony regarding a conversation

17    between the defendant and Mr. Waiters.  And then you have,

18    the follow-up to that is the attorney coming and doing that.

19          THE COURT:  Actually coming twice or something.

20          MR. PHILLIPS:   Yes.  He came twice.

21          And there was more evidence -- there was evidence,

22    there were jail calls that we set aside.  You may recall

23    there was some issue -- there was a motion filed to suppress

24    the introduction of the jail calls.  And I can proffer to the

25    Court and Agent Rape could, they have a copy of it, there was

1          more evidence that wasn't presented that --

2                    THE COURT:  Well, I'm not going to consider that.

3                    MR. PHILLIPS:   But we could proffer that.

4                    But the point is, just looking at Mr. Waiters and

5          what I just read, that's enough.  And then -- and I think the

6          Court, you know, certainly has enough information to make a

7          finding as to the credibility of Mr. Waiters as well as the

8          credibility of Mr. Ochoa, and they don't have to be overt

9          threats, they don't even have to be threats for them to be

10         obstruction.

11                   THE COURT:  What about Mr. Condon's point in his

12         brief that -- the comment about being silent could be

13         interpreted as simply an observation and not an effort to

14         obstruct justice?  How about that, Mr. Phillips?

15                   MR. PHILLIPS:  Um, well, I want to -- if I could

16         have one second to -- I need to grab Mr. Ochoa.  What I would

17         like -- you can -- I would want -- before I answer that, I

18         want to see what Mr. Ochoa said exactly.  But certainly

19         Mr. Ochoa is the one testifying about it.  His perceptions as

20         he testified I think are more important than us just

21         interpreting it in a vacuum.

22                   THE COURT:  That's okay.  I mean, I would like to

23         hear it, but I'm -- you know, Mr. Condon makes the point that

24         it was, you know, it was more of a sort of commentary that if

25         everybody stays quiet we are probably better off.  I mean,

1    that's getting -- that's, you know, that's close.  I mean,

2    there is some case law that says telling people to be silent

3    is obstruction, but is that advice to be quiet or is that an

4    observation?

5              MR. PHILLIPS:   If I could have one moment, Your

6    Honor, I just want to -- I want to -- I want to see exactly

7    what Mr. Ochoa testified as to that point.  I think I'm

8    close.

9              (Pause in proceedings.)

10             MR. PHILLIPS:   I'm having difficulty finding it.  I

11   believe we talked about it at the trial.

12             THE COURT:  My notes indicate that Mr. Ochoa was

13   told that he if he didn't say anything, everyone would be

14   okay.

15             MR. PHILLIPS:   Your Honor, I think that you could

16   argue -- again without -- I just wanted to see if Mr. Ochoa

17   expounded on that, I don't recall if he did or not -- you can

18   certainly argue, well, it's just an observation, but you can

19   also reasonably conclude based on the context -- you know,

20   part of, I don't want to call it a game, part of when these

21   defendants get arrested, there is a lot of behind the scene

22   things that you could expect in saying such things in front

23   of witnesses which may be couched or made without context,

24   look like a simple observation.  In a transport vehicle at

25   the county jail with other codefendants has a different

connotation.

And I think that given the context and the timing and where this statement was made, it's reasonable to believe that he was trying to influence Mr. Ochoa's decision and anyone else who was listening. It's not a simple observation like, the food today was nasty, it's something directly related to the case. And I think it sort of stretches -- it stretches logic to say that it was an innocent observation because Mr. Gibbs --

THE COURT: But it doesn't need to be an innocent observation not to be obstruction.

MR. PHILLIPS: Well, but I think -- I think it's not unreasonable to think that he was saying it to say -- yes, it's an observation, but he was saying it to influence the codefendants around him to help himself and to influence witnesses.

THE COURT: It just seems to me to be a completely different -- certainly the statements to Waiters is very direct.

MR. PHILLIPS: Yes, sir.

THE COURT: That particular statement in the vehicle, transport vehicle, where he says -- you know, he lays the framework, You do this, I'll do that. I'll pay you $10,000. I'll hire your lawyer.

Mr. Condon, anything you want to add? I'm kind

of -- I'm not persuaded the Ochoa thing is obstruction.  I'm
more concerned about the Waiters's statement.

MR. CONDON:  Well, the thing about Sidney Waiters
is that on his own at a bond hearing he admitted that he made
those statements.  So he freely and on his own admitted that
the stuff was his at a bond hearing with nobody around,
nobody forcing him to do anything.

THE COURT:  But he thought he had a deal.  I mean,
he testified at trial, I thought very credibly on this issue,
and that this was part of a deal.  He was supposed to get a
lawyer.  He's supposed to get $10,000.  He would take the
drugs, Mr. Gibbs take the gun.

Um, I mean, that's -- it looks like to me
obstruction.  I mean, that's a very different character.
When I compare that to -- and I share your view, I mean, it's
a little ambiguous about what the Ochoa statement means.  It
could mean what the Government says or it might be your
argument.  And I just think that the -- in that situation,
the Government's got the burden by a preponderance of the
evidence and I just think that he doesn't carry the burden.

The Waiters's statement is a different kettle of
fish to me because that is a very specific scheme.  When you
highlight the fact that the lawyer went over there but the
lawyer didn't deliver the original deal, he's the followup in
the original communication that is the foundation of this

discussion, is allegedly between Mr. Gibbs and Mr. Waiters. That's my concern.

MR. CONDON:  Well, the thing is that obviously that's a different person and --

THE COURT:  Well, let's just take -- let's go back, let's eliminate the attorney's role in this for a second. Let's just go to that discussion in the vehicle that day, on his transport where he says, Here is the proposal.  Address just that.

MR. CONDON:  Well, I would address whether the credibility of -- Sidney Waiters is credible or not.

THE COURT:  Other than credibility, what else you got?

MR. CONDON:  Um, because it's just one word against another.  That's all it is.

THE COURT:  I understand.  What else you got?

MR. CONDON:  That --

THE COURT:  I've got only one evidence in the record in front of me.

MR. CONDON:  I think that's all you've got is just two people saying --

THE COURT:  I've got one person.  I've got Mr. Waiters.  I don't have anybody else.

MR. CONDON:  Right, but just his testimony.

THE COURT:  It's his testimony, that's correct.

1            MR. CONDON:   And I think it's very inconsistent,

2      Mr. Waiters is, and I think that's why he's not a credible

3      individual.

4            THE COURT:  Any further argument?

5            MR. CONDON:   No, sir.

6            MR. PHILLIPS:  One quick point.

7            Waiters, it was sworn testimony, first of all.  And

8      the attorney, if you -- I understand the Court wanted to

9      remove the attorney from it, but the attorney -- the attorney

10      shows the consistency of the statement because Waiters says,

11      We had this conversation, and the attorney is following up on

12      that and doing exactly what they were talking about.

13            THE COURT:  In furtherance of that scheme.

14            MR. PHILLIPS:   In furtherance of the agreement

15      previous.

16            THE COURT:  And he wants all the drugs, not part of

17      the drugs.

18            MR. PHILLIPS:   Yes.

19            So that's -- you don't just have Waiters; you have

20      an act in furtherance of the agreement that Waiters testified

21      to.

22            THE COURT:  You know, Mr. Phillips, I was attempting

23      to make the point that Mr. Condon was treating it as if the

24      entire scheme came from the attorney and that wasn't correct,

25      that -- the initial communication.

1          Anything further, Mr. Condon, on this point?

2          MR. CONDON:   No, Your Honor.

3          THE COURT:  I overrule the objection on the

4     enhancement relating to obstruction entirely on the issue of

5     the Waiters's discussion.

6          I sustain the view of the defendant regarding Ochoa.

7     I don't believe the Government's carried its burden of

8     showing by a preponderance of the evidence, but there only

9     need to be one basis for the obstruction, so the objection to

10    the two-point enhancement of the defendant is denied.

11         Now, I think that's the list of the objections, Mr.

12    Condon.  Are there any others that you wish to bring in front

13    of me before we proceed to sentencing?

14         MR. CONDON:   I don't think -- that was the basic

15    ones, but I do want to make my March 23rd, 2012 objections

16    part of the record.

17         THE COURT:  I welcome that.  You are welcome to do

18    that, sir.  I've read that several times myself; I thought it

19    was a very fine summary written.

20         So if you would like to mark that and make it an

21    exhibit, we'll be glad to make it an exhibit, Mr. Condon.

22         MR. CONDON:   Yes, sir.

23         THE COURT:  And let me pronounce, based upon me

24    addressing all of the objections, the Guideline provisions.

25         The total offense level is 46.

1           The Criminal History Category is V.

2           The Guideline is life and 10 years supervised

3    release.

4           And I am operating on this basis that the range is

5    10 years to life.

6           MR. FRYE:   Your Honor, I'm sorry, if we are

7    operating on 10 years to life, the SR would be at least five

8    years.

9           THE COURT:  The -- I'm sorry, the --

10          MR. FRYE:   The supervised release.

11          THE COURT:  Is a minimum of five years?

12          MR. FRYE:   At least five years instead of at least

13   10 years.

14          THE COURT: And if it's five years, is there a

15   maximum?

16          MR. FRYE:   No, sir, Your Honor.

17          THE COURT:  So the supervised release will be five

18   years to life based upon the Court's finding that I'm

19   relying -- I'm not giving the 851 enhancement and it's 10 to

20   life is the range.

21          Okay.  Mr. Condon, I will hear from you on

22   sentencing in any order that you think is advantageous to

23   your client.

24          MR. CONDON:   Your Honor, in this situation we filed

25   a memo asking for a variance.

                    THE COURT:  Yes, sir.

                    MR. CONDON:   And the various points of that memo

are that the 3553 factors are to be considered by the Court

with regard to sentencing after going through the Sentencing

Guideline calculation.

                    Our position is that when the Court looks at those

factors, you know, the 3553, to impose a sentence that is

sufficient but not greater than necessary to comply with the

purposes set forth in 3553, I think that admonition is a type

of admonition that Congress wanted to show that the old

classic type of argument with regard to punishment where you,

say, you throw the book at him or put him underneath the jail

where there is no mercy, those type of admonitions, I think,

are out the door.

                    THE COURT:  I share that view.  The issue is I need

to have a sentence that is sufficient to serve the purposes

of the act but not greater than necessary to accomplish that

end.

                    MR. CONDON:   Right.

                    And I think you have that type of flexibility to

impose a sentence that is -- that deviates significantly from

the Sentencing Guidelines.

                    What I think is important about the statutory

minimum, if you looked at it from the standpoint, well, you

know, initially it was -- there was a 20 to life.  Well then

1    there is basically -- for a man that is 40 years old, there

2    is not that much difference between 20 years and life because

3    he's going to basically be old when he gets out regardless.

4            But when you look at it from the standpoint of a

5    mandatory minimum of 10 years to life, then there is a wider

6    range and different perspective, and you realize how --

7    obviously how serious it is to impose a sentence of

8    significant time.

9            And for Mr. Gibbs, a sentence that would require him

10   to spend the rest of his life would be extremely, extremely,

11   extremely harsh.

12           Your Honor, what we are -- and I want you to hear

13   from the family and I want you to hear from Mr. Cohen and

14   hear from Mr. Gibbs in terms of sentencing.

15           Now, the --

16           THE COURT:  And Mr. Condon, let me say to you that

17   we started at 10:00 this morning, and I will go as long as it

18   takes.  Do not rush, this is important to Mr. Gibbs --

19           MR. CONDON:   Yes, sir.

20           THE COURT:  -- and we'll take all the time we need.

21   So if anyone wishes to speak, I'll be glad to hear from them.

22   I want to hear this fully.  It's an important decision to be

23   made and I want to have the best evidence both from the

24   defense and from the Government upon which to make this

25   decision.

1          So please proceed, but don't feel you are in any

2     rush to get through this proceeding.

3          MR. CONDON:   Thank you, Your Honor.

4          I think the important thing is to realize that --

5     and Marcus has participated in programs at the detention

6     center.  You know, that's a little, you might say, unusual.

7          THE COURT:  I read the certificates and I read the

8     letter you submitted, yes.

9          MR. CONDON:  And I think that's quite admirable of

10    him, and I think that shows a different side of Marcus.  I

11    know that the seriousness of this case and how serious it is,

12    but there is a different side to Marcus.  He is a family man.

13    His son was supposed to be here but he is in the military; he

14    couldn't be here, so he sent a letter.

15         But I did want you to kind of go through the people

16    that are here to testify, to talk about Marcus, and --

17         THE COURT:  You know, Mr. Condon, the Government

18    will do a great job of telling me all the bad things about

19    Mr. Gibbs, and I'm hoping the family will share with me

20    another side of him so we have a fuller picture from which to

21    base sentencing.

22         MR. CONDON:   Yes, sir.

23         First I would like to call Mr. Cohen just to give

24    his perspective and what basically to look at with regard to

25    this case.

THE COURT:  Very good.  If you would just come to the podium.

If you could state your full name, sir

MR. COHEN:   Yes, sir.  I'm Howard Gerald Cohen.

THE COURT:  Yes, sir.  Please proceed.

MR. COHEN:   I'm a private detective with 40 years experience.  I have investigated a number of drug-related cases in my career.  I'm also the executive director of the Low Country Justice Commission, an organization trying to bring about equal justice, equal education and equal economic opportunity.  The Commission is made up of former judges, attorneys, civil rights leaders, clergy and concerned citizens.

I was brought into the case shortly after Marcus Gibbs was convicted due to a chance meeting with Mrs. Gibbs's mother who asked me to look into factors surrounding the hire of Mr. Gibbs's first two attorneys.  They had paid them large sums of money and these lawyers were taking the money and demanded more money after the State and Federal cases were combined.

The family had no more money; therefore, they had to use the Government-paid lawyer, which of course is Joe Condon.  Mrs. Gibbs's home, I understood, was in foreclosure at that time.

My job is to ensure that Mr. Gibbs received a fair

trial.  Certain questions have arisen that demand answers.

When I complete my investigation, it's my sincere hope that

Mr. Gibbs and his family are satisfied that Mr. Gibbs

received a fair trial and fair treatment by the Federal

Government.

According to the United States Department of

Justice, Office of Justice Programs Bureau of Justice

statistics, black non-Hispanic males have an imprisonment

rate seven times higher, seven times higher than white males,

non-Hispanic males.

An article from the *USA Today* posted September 22nd,

2010 titled:  "Prosecutor's Conduct Could Tip Justice Scales.

With the help from legal experts and former prosecutors, *USA*

*Today* spent six months examining federal prosecutors' work,

reviewing legal databases, department records, and tens of

thousands of pages of court filings.  Although the true

extent of the misconduct by prosecutors will likely never be

known, the assessment is the most complete yet of the scope

and impact of these violations.

"*USA Today* found a pattern of serious, glaring

misconduct, said Pace University law professor Bennett

Gershman, an expert on misconduct by prosecutors.  It's

systemic now and the system is not able to control this type

of behavior.  There is no accountability.  He and Alexander

Bunin, the Chief Federal Defender in Albany, New York call

the newspaper's finding just the tip of the iceberg because
many more cases are tainted by misconduct that are found.  In
many cases, misconduct is exposed only because of vigilant
scrutiny by defense lawyers and judges."   That was one of
my concerns with some of the information on this particular
case.

In addition to, in my opinion, misleading the jury,
and even, Your Honor, as to Mr. Gibbs being at the center of
an extensive drug trafficking ring, information came to me
from my client of prosecutorial misconduct which we are
looking into.  That's why I wanted to speak with the jurors.

I was investigating this fact when Attorney Condon
received a phone call from Your Honor asking me to write
letters instead of going to their residences.  This is very
time-consuming, as I need to address questions by mail, then
I have to wait for a response, then I have to come back with
more letters --

THE COURT:  But you know, Mr. Cohen, I have an
obligation to protect my jurors --

MR. COHEN:   I understand.

THE COURT:  -- who were feeling intimidation, and I
have to balance the right -- I want nothing to obstruct the
ability of people on behalf of Mr. Gibbs to explore any
inappropriate conduct or action.  I did not personally
observe it at trial.  I would have stopped it if I had.

1                    MR. COHEN:   Right.

2                    THE COURT:   And I'm open, should evidence come

3          forward -- in my recent telephone conference with counsel,

4          the prosecutor stated to us that he would want to be aware if

5          there was any impropriety; he was unaware of any.  And I've

6          never seen any suggestion from his office of anything like

7          that.  But if there is evidence, we welcome that.  I want you

8          to know that, and I'm not trying to obstruct you in any way,

9          but I've got to protect -- you can imagine how intimidated a

10         juror may feel who have, you know, participated in a case

11         involving Mexican drug cartels where someone appears at their

12         home.

13                   So I'm trying to balance that.  And the way I've

14         elected to do it, and I think it's a reasonable way, is to

15         have you communicate with them and make it clear that they

16         have a right and not the obligation to speak to you.  And if

17         they wish to, it's their right to do that.  It's not a

18         perfect solution, but it's one that tries to balance the

19         interests of everyone here.

20                   MR. COHEN:   And I can understand that.  I

21         understand the reasoning, you know, with what the allegations

22         are of the extent of the drug trafficking, you know, as well,

23         but that made things a little bit harder.  It's very

24         difficult for me to interview somebody on the telephone or,

25         you know, in letters.  I like to talk to the person

1      individually.

2            Um, Joe had mentioned to me that they thought they

3      were intimidated.  I was -- I have been doing this for 40

4      years, you -- you know, you get a lot more with sugar than

5      vinegar.  I never go into a witness or anybody that I'm

6      interviewing to intimidate.  That's not going to do me any

7      good, especially with jurors.

8            THE COURT:  Of course, Mr. Coleman, it may have been

9      unintended, but I will tell you that my chambers -- those

10     jurors were alarmed, you know, that someone was -- because I

11     think they view themselves as generally anonymous, and then

12     suddenly someone is showing up to their home, and

13     particularly the nature of these allegations.  But I'm here

14     today to deal with the sentencing and I --

15           MR. COHEN:  I understand.

16           THE COURT:  -- and my major issue is Marcus Gibbs,

17     the man.

18           MR. COHEN:  Right.

19           THE COURT:  And I welcome any information you have

20     that's relevant.  I'm not trying to cut you off, but I'm sort

21     of the last guy in the world to worry about racial profiling

22     or anything like that with my background.  So I'm the last

23     guy you need to worry about about that.

24           What we need to do is I'm trying to be the

25     fairest -- provide the fairest and most just sentence.  And I

1    take it you've had some contact with Mr. Gibbs and his

2    family.

3            MR. COHEN:   That's correct.

4            THE COURT:   If you have information to share with me

5    about him that would -- about an appropriate sentence, I

6    would welcome you share that with me.

7            MR. COHEN:   I would like to, if the Court will

8    indulge me, go through some of the factors that I think are

9    questionable that were the source of some of our

10   investigations.

11           THE COURT:   I'm glad to hear that, but I want you to

12   remember that if there is a reason the verdict should be set

13   aside, that's a different matter.  And it wouldn't -- I know

14   of no information that would justify that, but if it came to

15   my attention and I determine it was appropriate, I would set

16   aside the sentence.  That's not really relevant to what the

17   sentence, because the sentence --

18           MR. COHEN:   I got you.

19           THE COURT:   -- is valid as of now.  And what I'm

20   trying to determine is the information about Mr. Gibbs

21   personally and what's the appropriate sentence for him.

22           So I -- what will be most valuable to us -- I'm not

23   trying to cut you off, I may one day hear all this

24   information you have in a motion to set aside a verdict --

25   but at this point what I need is information relating to

1    Mr. Gibbs.  That's what is relevant in this proceeding.

2              MR. COHEN:   I see.

3              THE COURT:  And I know you've had some chances to

4    talk with him, to talk to his family, and I welcome any

5    information you can share with me.

6              MR. COHEN:   Right.  And the main thing is, in terms

7    of that, we are questioning the extent of his involvement in

8    the drug trade, you know, that these are things that, you

9    know, that I should probably address with you later then.

10             And I've spoken with Mr. Gibbs and his family

11   extensively, um, over the past several months.  And, you

12   know, he's become an extremely religious person and he has a

13   lot of faith in God.  That's what he told me, and, you know,

14   in here with his discussions with Mr. Condon.  Basically, he

15   wants to leave it in God's hands.  Of course we can't afford

16   to do that, we live in a material world.  At any rate, you

17   know, I'll conclude my comments at this point.  And I

18   appreciate your indulgence.

19             THE COURT:  Well, Mr. Cohen, you having had spent

20   some time with him, do you have any thoughts about the

21   wisdom, the lack of wisdom, assuming that he is guilty of as

22   he has been charged, with the appropriate -- any guidance to

23   the Court about knowing Mr. Gibbs about what an appropriate

24   sentence would be and whether a sentence of life is necessary

25   to accomplish the protection of the public and so forth?  I

1    wanted your thoughts about that.

2         MR. COHEN:   I don't think so.   I think, you know,

3    in my personal opinion from my experience over the past 40

4    years, I'm involved in a lot of interfaith activities, so I'm

5    involved with a lot of clergy on a major level.   I think that

6    a life sentence for this young, this fellow, he's not a young

7    man anymore --

8         THE COURT:   He's looking younger to me every day at

9    my age.

10        MR. COHEN:   I know.   But frankly, that would be --

11   that's the end of his life, you know, that's it.   The

12   problems that he's had, what he was involved with in the

13   past, he seems to be a changed man from the discussions that

14   I've had with him.   Again, it appears that he's become very

15   religious.   You know, as I said, everything is in God's

16   hands, that's his perspective on this whole thing.   I don't

17   see him that much as a threat necessarily.   And I disagree

18   with the assessment of the prosecution, of the Federal

19   Government, of the extent that he was involved, you know, in

20   these matters.   I mean, I know the evidence is there, but

21   there is questions about the evidence.   But in terms of his

22   person, you know, I frankly, after meeting him and talking

23   with his family and knowing his situation, you know, I would

24   hate to see him have a sentence that puts him away for the

25   rest of his life.   Rehabilitation is an important factor, of

1  course, in the judicial system. And I, you know, I would

2  hope that you would see it that way.

3  THE COURT: Thank you, sir. I appreciate you coming

4  in.

5  MR. COHEN: Appreciate it. Thank you, Your Honor.

6  THE COURT: Mr. Condon, next witness.

7  If you could state your full name, sir.

8  MR. WILLIAMS: Robert Earl Williams.

9  THE COURT: Yes, sir.

10  MR. WILLIAMS: I praise God for this opportunity

11  and I praise God that you gave me this opportunity.

12  I'm here to say that when I look at Marcus, I see a

13  young man that is looking for another chance. I see a young

14  man, he has nine children; I have eight, four boys and four

15  girls. He needs to be in their life. I'm hoping and

16  praying -- we did a lot of praying -- that the decision that

17  comes from the Judge's mouth will affect his future with his

18  children. So we are asking you to search your heart and make

19  the best decision that would impact his life with his

20  children, his children, nine children. We all have done

21  wrong in life. And if God wasn't a God of a first and a

22  second chance, none of us would be here. So I praise God

23  that if he is a God of another chance. So we are asking you,

24  please give him a chance. He need to be in his children's

25  life, raise those kids.

1          I'm a spiritual man.  I believe in the Holy Bible,

2     this Bible right here that sits here, and God is a God of

3     love.  Any time you do something -- and God says that if you

4     ask for forgiveness, he will see your forgetfulness.  So God

5     is a God of another chance, not a first, second, third and he

6     stops there.

7          I would love to see Marcus released.  I've talked

8     with him.  I seen him at the jail.  He is a spiritual guy.  I

9     have the spirit of God in me.  And I'm not passing judgment

10    on no one else in here, but my spirit made contact with his

11    spirit.  There is a change that happened with him in prison,

12    in jail.  The Lord told me when I first -- when I got the

13    call that Marcus got arrested, the Lord said he allowed that

14    to happen to get Marcus attention, and God got his attention.

15    Isaiah 55:11 says, My word shall not return onto me void.  If

16    God speak a thing it will come to pass, I grant you that.

17         And I look at Marcus, Marcus is looking -- he is

18    looking for hope.  Let's give him hope.  Let's not kill his

19    hope.

20         My father, I'm 48 years old, never been in my life.

21    When I saw him, he was a dead man in a casket this year,

22    March of this year, 79 years old.  I never knew my father.

23    My mother raised us.  She did the best she could.  Christian

24    family.  Sure, yes, I did the prodigal son, I was back and

25    forth, but the word of God says that train up a child in a

way that he should go, no agenda, when he is old, he will not depart. God is not talking about your age because you've got old people, when you are well seasoned, you are not going anywhere. And the spirit of God made contact with Marcus, I can tell you, and I know in just my word to you, I know there is a change in this man without a shadow of doubt. God said the other day, Joshua, call him Joshua. If you know the story about Joshua, he took over after Moses. Marcus got work to do in the streets. And I will do my best to keep him by my side.

I'm a member of For Your Glory International Ministries on Dorchester Road under Pastor Prophetess Mathina Ashley (ph). And I told Marcus, I said when Marcus get out, I would love Marcus to join my church, but -- you know, I don't want to take him away from his other church, but it is a decision he have to make.

God calling you Joshua. Joshua, you've got work to do in the streets. You are working in jail. People got saved and delivered through his voice because God used him.

Now, when God said Joshua, Moses had to let Joshua take charge and Joshua led the people. Marcus has young men to be led by him.

So we are asking you, please, please consider his children. I saw my father as a dead man in the casket, 79 years old, never been in my life. Over the years, I used to

think about my father.  Kids, I would see their parent come
to the school, my mother by herself.  Sometimes she couldn't
come because she worked.

So please, we are not demanding, we are asking you,
set him free, please.  He has work to do.  That's what God
said.  I don't know your faith, I don't know your level of
faith in God, but God called him Joshua.

THE COURT:  Thank you.  Thank you, Mr. Williams,
appreciate you coming.

Yes, Mr. Condon, next.

THE COURT:  Could you state your name, please.

MS. JOHNSON:  Yes, sir.  Doris Johnson.

THE COURT:  Yes, ma'am.

MS. JOHNSON:  I'm here as a support system for the
Gibbs family and for Marcus.  I have been in prison ministry
since 1986 and still today.  Behind the walls, I had the
opportunity to perform Bible studies with Marcus within the
county jail while as a volunteer chaplain.

THE COURT:  Thank you for doing that.

MS. JOHNSON:  Thank you, sir.

And I've seen the change in working with him.  I'm
asking today, Your Honor, not to -- I -- I know that sin has
consequences.  I'm not asking you to overlook what he's done
wrong.  We make decisions; we have to live by those
decisions.  I'm simply asking for mercy, whatever that mercy

1    is for your part, sir.  I'm not asking you not to do your

2    job; I'm asking you to do your job and I'm asking you for

3    mercy.

4              And thank you.

5              THE COURT:  Well Ms. Johnson, thank you for coming.

6              MS. JOHNSON:   Thank you, sir.

7              THE COURT:  Could you state your name, please.

8              MS. HOLMES:  Sharnay Holmes (ph).

9              THE COURT:  Yes, Ms. Holmes.

10             MS. HOLMES:   Marcus is a friend of mine for about

11   seven years.  And I just wanted to say that he's a good

12   person and he has impacted my life in more ways than one.

13   And like even at my lowest point, Marcus lifted me up.  And

14   at times I wanted to give up, but it was Marcus who

15   encouraged me.  And through all them the time -- like I know

16   Marcus.  I went to college, I gave up, I start -- I just gave

17   up on life, but it was Marcus who encouraged me to go back to

18   get my undergraduate degree.  And even after that, he still

19   encouraged me.  Even in the midst of his troubles, Marcus

20   always encouraged me.  He's always my voice of reasoning.

21   And to this day I can go to Marcus for anything, any of my

22   problems, and he's always my voice of reasoning.  Marcus is a

23   good father.  And in the community maybe he was alleged of

24   many things, but what people -- other people say about him,

25   that's a reputation.  His character is none of that.  That

don't define him.  Marcus is a good person.  And if he -- if
I'm only his friend and he's impacted my life in that way,
you have to imagine what impact he will have on his family.
And I just want you to have mercy on Marcus because he's a
good person, and everybody makes mistakes, nobody is perfect.
And I'm just asking you to have mercy on his sentencing.

THE COURT:  Thank you so much.

MS. HOLMES:  Because Marcus, if he gives up on
himself, it affects a lot of people.

THE COURT:  Thank you.

Hello.  Could you state your name, please.

MS. POINSETT:  Sister Jane Poinsett.

THE COURT:  Yes, Ms. Poinsett.

MS. POINSETT:  Oh, Lord, our Lord, how excellent is
thy name in all the earth who set that glory above the
heavens.  Give order to Your Honor, the Judge.  Um, you look
like a christian.  I was sitting back there -- and I was a
Sunday school teacher for over 40 something years.  And I
usually go on the east side of Charleston and pick up 25 to
30 kids every Sunday morning.  Every Sunday morning we walk
to church.  We have like 25 children be walking with me to
the church on 230 Huger Street.  And when we had a Bible
school, the Lord let me gather over 200 children, Judge, and
take them to the Bible school.  And as many times -- numerous
times I went to see Marcus, and every time I would go to see

Marcus, he speak about God, he speak about love, he speak
about God. And he -- he talks about the scriptures. And
Marcus is a -- he really is a good person. He really has
changed. You know, God has changed him in the prison. And
like I say that, you know, we had prisons way back in, you
know, 2,000 years ago when Christ was -- you know, they had
prison. So we consider that to know what he did probably he
would have to be sentenced, but we are asking you today just
consider him, Judge. And I know you -- you look like a good
person to me, you really do. And please consider him. He
has the nine children, and, you know, they are children who
really want to see their father. So consider him, Judge, and
we thank you very much.

      THE COURT: Thank you, Ms. Poinsett. I appreciate
you coming.

      THE COURT: If you could state your name, please.

      MS. DOUGLAS: Jaquetta Douglas.

      THE COURT: Yes, Ms. Douglas.

      MS. DOUGLAS: I'm Marcus sister, there is five of
us, and I'm the second to the oldest.

      And my brother, Marcus, he's a very good person.
My -- I always remember my parents always said to all of us
as the five of us to stick together. When one hurt, all
hurt. Your Honor, back in 1998, a leg fell out of that
chair, we lose a brother in 1998. We all went through that

together.  We all hurt behind that.

And Your Honor, if you took my brother away from me, oh, Lord, I just, I know we will hurt, and it will be like losing another brother.

Marcus has nine kids, and he was in each one of their life.  He was a good father.  He might wasn't there all the time financially, but he played a part in each one of his kids' life.

And I just want you to have mercy upon him.  He's -- he calls me every night.  He does Bible study in jail.  He -- as a matter of fact, he had four guys who came out of prison and called me looking for a church, they call them Pastor Marcus Gibbs.  And Your Honor, you can ask him anything about the Bible and he will tell you exactly where to find it.

And Your Honor, please have mercy upon him.  I thank you.

THE COURT:  Ms. Douglas, thank you for coming.

Yes, ma'am, if you could state your name?

MS. GRANVILLE:  My name is Shawanda Granville and I'm five -- I'm the mother of five of his children.

THE COURT:  Okay.

MS. GRANVILLE:  I'm here today to ask for your consideration, ask for you to allow God to touch your heart not only for Marcus but for -- and his family, but for his children.  Excuse me.

1              THE COURT:  Take your time.

2              MS. GRANVILLE:   His children love him.  It's hard

3      for us.  It's hard for them and it's hard for me to comfort

4      them, to explain to them if their father is coming home.

5      They love the ground that he walks on.  We may have gone

6      through our changes.  He made mistakes, I made mistakes, but

7      in order for us to -- we have to learn from our mistakes and

8      move on and do better.  I have two boys from him.  They need

9      him.  They need his guidance so that they won't be in this

10     chair.  My girls need him so that they wouldn't -- they can

11     have a male figure to guide them also in making decisions on

12     anything, really, because that's what he does now.  When we

13     talk to him, we pray, he calls them, we put the phone on

14     speaker and we pray together, and they look forward to that.

15             I've -- by talking to him since this situation has

16     happened, I saw -- you know, I saw a change in him.  Not only

17     was he a good father now, he's a great father.  I mean,

18     sometimes he got to get me straight and remind me that I have

19     to get on my knees and pray because it's not easy for me

20     raising five kids by myself.  I never would imagine my kids

21     being without their father, having them -- even if we were

22     not together, just having him, going on weekends with him,

23     going on trips with him, just having their father to hug and

24     help them get well if they are sick or whatever the case is.

25             But I'm asking for your consideration.  I'm just

asking for God to take control and for you to allow God to

use you and open up your heart and have consideration for the

fact that he has kids, he has goals, he has dreams to go out

and touch boys, youth, you know.  He been through a lot, he

been through -- he's going through a lot.  And if he come out

this, he can touch young males out there so that they

wouldn't be in this position, not only his children, but

other guys or young boys that's getting into the wrong crowd

or whatever it is, youth development.  And also leading

God -- leading everyone to God.

When I fall short sometimes he calls and he tells me

to pray and he tells me.  It's going to be all right, just

leave it in God's hands, when I feel like just giving up.

But I know I cannot give up because I have those five kids.

And if his kids don't have him -- they need me, but at the

same time they listen to him, they look up to him, they love

the ground that he walks on.  And for them to lose that, I

just ask God that you -- that -- I just ask you that you open

up your heart and allow him to be in his children's life.

THE COURT:  Thank you, Ms. Granville.

MS. GRANVILLE:  Thank you.

THE COURT:  Could you state your name, please,

ma'am?

MS. GIBBS:  Yes.  My name is Keisha Gibbs and I am

Marcus sibling.

1           Like my sister stated, there was five of us and now

2     there is four.  In the range of our ages, my two older

3     sisters, this was a gap of five years between us.  And

4     Marcus -- my brother Zekial who has passed away, we are like

5     the other set closer in age.  So of course I love my brother

6     dearly.  And Your Honor, I don't want to lose him.

7           And I do have a lot of respect for the court system,

8     but I feel that it's just so unfair and unjust for someone's

9     life to be taken away on someone else's word.  I sat through

10    the court hearing, I listened to everything the prosecutor

11    said, I have read a lot of the transcripts, the telephone

12    calls, the wiretaps that they have done, and Your Honor, I

13    found, what, two or three of the wiretaps, I look at the

14    situation on how they stated that Marcus was under

15    surveillance for two years but no pictures, no telephone

16    calls.  So it's kind of unbelievable that his life is in

17    someone's hand on what someone else who is sitting behind

18    bars are saying about him.  We all know the situation of

19    that.

20          Marcus is a very kind hearted person.  Marcus will

21    give you your last -- Marcus will do anything for you, if you

22    are in need, just ask.  Like his kids' mother said, it

23    doesn't matter who you are, if he can help you, he will help.

24    That's just the person that he is.  In my daily walk, I've

25    come across people all the time who would say, Oh, you look

like Marcus and I was like, Yes, that's my brother.  They

said, That one, he has a heart of gold.  He's always believed

in doing for the communities and helping out.  He created a

softball team to try to get things going back in the

communities because the kids are just falling by the wayside.

We know what the gadgets and the TVs and things of that

nature, the kids are just being -- going to the street.  I'm

not saying he's perfect because none of us are, but I know

one thing, Lord knows he deserves another chance.

Thank you.

THE COURT:  Thank you, ma'am.

Yes, ma'am.  Could you state your name, please?

MS. GIBBS:  My name is Kathleen Wade Gibbs.

THE COURT:  Thank you, Ms. Gibbs.

MS. GIBBS:  I was the mother of five children.

Well anyhow, Marcus was supposed to be here.  I had four

kids, one normal, the rest was a C-section.  And I think when

I got pregnant with Marcus -- God knows that he was going to

take Ezekiel Junior at an early age in 1998, and then in 2001

my husband.

First I want to say that when Marcus from baby, my

husband took all five of them with me to Sunday school and

church.  When he was three years old, he used to go to

church, listen to the minister, and when he come home, he'll

get a five gallon can, stand up on it and preach to his

cousins.  When they said, Oh, we ain't coming today, we are
going to play.  So he said, Okay, he'll get the dog, tie him
to the tree and get the cat and put him in a little box and
he preach to the cat and the dog.  And he -- Marcus, he's a
loving person.  I mean, he really, just a kind person, look
out for people and everything.  And even if I'm hurt, he's
there to comfort me.

In 2001 when my husband took sick, he was the first
one got there when he find out.  My husband, he picked him
up, carried him like a baby to the bathroom.  He bathed him
and everything.  And in 2001 my husband died.  He was in one
room and I was -- we had -- well, we was taking turns, each
one of us had like four hours to sit with my husband.  And he
jumped up, Well, mommy, I forgot that it's your time to be
relieved and when he said that I said, Okay.  I said,
Marcus -- he said, We have to turn dad.  So I pulled him to
me and he put the pillow behind him and my husband neck just
fell to the side.  And he's like, Oh, mama, daddy gone.  So
you go in the room, I'll handle this.  So he called hospice
and he told them that his dad had passed, and I see that it
hurt him.  He say, Oh, Lord, he say, you left me here with
five children -- I mean four -- three sisters.  And I said,
How am I going to do it with these girls?  And I said, Oh,
Lord, help me, help me, and he was there right by my side to
make the arrangements and everything.

And Marcus, you know, I'm not saying he is perfect, but he is not what they say about him in the paper. I'm not -- I'm not saying that he's did no wrong, but he was, um, my baby -- he's the baby. And he was, I went to see him at the jail and I have to go in for a knee operation because all my cartilage is gone in my knee, but I was taking a lot of pain. So I tried to -- I said, Okay, go ahead. And he said, Okay, I've got to teach Bible class. So I try to wait until he gone so he wouldn't see me hopping. And he stand in the corner and then he called my daughter and say, How y'all don't tell me mommy hopping on her leg like that? I don't want no grans going over there to mommy now, y'all take care of your own grans. So I'm saying, Lord, when I go to get my operation, who am I going to have to lean on? There is no more man in my house. Marcus is the only man I got left.

And there is a part in the Bible that says, when Jesus was on that cross, he said, Mother, behold thy son, son, behold their mother. So I'm looking for he to hold me. I'm 69 years old. If my son go to life, I wouldn't be here when he come back. Even if my son get 20, 10 years, I'll be an old lady. I supposed to be having my cane today, but my granddaughter put it somewhere I couldn't find it. I said, Lord, give me strength to climb those stairs and come.

So I'm asking you to have mercy on my son and please don't take my last son from my arms, the last man in my life.

1          I thank you and God bless.

2          THE COURT:  Thank you, Ms. Gibbs.

3          Hello.  Could you state your name, please?

4          MS. GIBBS:  My name is Toneshia Gibbs, I'm the niece

5     of Marcus Gibbs.

6          THE COURT:  Yes, ma'am.

7          MS. GIBBS:  I want to say he's an uncle but I also

8     take him as a father.  He has been there plenty of times,

9     there is things I go to him about that I can't go to anyone

10    else.  Even through jail, he changed the life of my boyfriend

11    as well.  We would go see him.  We would go visit him.  You

12    know, he taught us about God.  He taught us -- he got us

13    through a lot of things.  And now my boyfriend, he never had

14    a job, he always was in trouble in school, and you know, have

15    a record, and is now on probation.  But now he has a job, we

16    go to church on Sundays, we work through any problems.

17    Anything I ever need I would come to him for because he

18    always have the -- and he never just take my side, he would

19    also tell me the truth.  He was always there for me as a

20    child.  And he is just one of the best persons in my life

21    because he brought me through a lot.  He taught me a lot.

22    And words just can't explain how much he means to me as a

23    person, as an uncle, and I look at him as a father, as well.

24    You know, he would call me whenever I'm down even though he

25    is in the position where he's in jail and I would hate to go

to him with my burdens, but he just brought me to the light
and showed me how to handle everything.  He showed me how to
handle myself as a woman.  I would have been astray as a
child if it wasn't for him.  He guided me through life.  He
would guide, talk with me, you know, as far as his girls, as
far as his sons, and I take them as sisters and brothers
myself.  But he's just a very good person.  Words just can't
explain how much he made a big change in my life and to
others.  I have friends who I took down there to see him.  He
changed the life of a lot of young guys.  I know guys from
school who was incarcerated with him that is now walking
around going to church, is now on the right path.  It's
just -- he's a very -- he's a christian man and he knows a
lot.  He knows more than me.  And I'm surprised of how much
change that he -- that a lot of young guys, including my
boyfriend, and he got our life together.  He got my life
together and he was a big part of my life.  He's a very good
person.

    THE COURT:  Thank you very much.

    MS. GIBBS:  Thank you.

    MR. WILLIAMS:  The Lord say accept the assignment.
Joshua, young men need to hear you.  Young men need to hear
him.  America, jails are filled with young people.  When they
go in prison, either they become a Christian or a Muslim.  I
have been in Islam for 10 years.  And when God brought me

1    out -- I went in in '96, came out in 2006.  I say, Lord, I

2    wasted 10 years.  You know what God said?  He said, No, you

3    didn't.  He said you know them, you go win them.  See, what

4    God is saying, if the majority are Christian, true Christians

5    can rise up how Muslim believe in the Koran and Prophet

6    Muhammad, it would be a different world.  We must show love.

7    God showed me three major events that's going to take place

8    before Christ come.  America brace yourself.

9         THE COURT:  Thank you, Mr. Williams.

10        MR. WILLIAMS:   Please, he has work to do.

11        THE COURT:  Thank you, sir.

12        MR. WILLIAMS:  Accept your assignment, go to work.

13        MR. CONDON:   Your Honor, I do have a letter from

14   Marcus's son Darius that was September 11th, 2012.  He

15   couldn't be here, so I was going to read it.

16        THE COURT:  Please proceed.

17        MR. CONDON:   "To whom it may concern, my name is

18   Darius Lanes Senior, and I am Marcus Gibbs's senior oldest

19   son.  Just wanted to write this letter before you decide to

20   condemn him to a sentence.  My father has always been a part

21   of my life.  Actually, he took me to live with him and my

22   grandparents when I was five months old due to mother was

23   unable to financially provide my needs.  I had a lot of good

24   times with my father and he stored good moral values in me.

25   He is a loving and caring person who does everything he can

for everyone that he knows regardless of his relationship
with that person.  If he can help you, he will no matter what
the costs or consequence.  In fact, if there were more people
like him, it would make the world a little better.  Even
though he's not perfect, he tried his best to be.  I am one
of nine, and every time I talk to the other eight children,
eight of his children, the only thing they say about him is
that they miss him and love him very much. The thing about it
is that not only his kids feel that way, but everyone is
feeling the same way.

"As I said before, he may not be perfect, but I feel
like we all have missed him for too long already.  Please let
him come home soon.  I have love to be there" -- "I would
have loved to be there but due to my commitment to the United
States Army I will not be able to attend the sentencing
hearing.

Sincerely, Darius Lane."

THE COURT:  Thank you very much.  Mr. Condon, any
other -- anyone else you would like to speak?

MR. CONDON:  Mr. Gibbs did want to address the
Court.

THE COURT:  I welcome to hear from Mr. Gibbs.

Mr. Gibbs, I like your family.

THE DEFENDANT:  I love them.  They are all right.

First of all, I would like to apologize for the

inconvenience we had a little while ago. It is an emotional time and I'm sorry for that.

My name Marcus Gibbs. Ain't nobody know Marcus Gibbs better than Marcus Gibbs. Yeah, I do some good things, and I'll go all out for my family. You know, when I was little, there was about 58 of us grans and first cousins. My grandma and granddaddy had 11 kids, and they all had Gibbs last name and it was, don't mess with the Gibbs. And I was about the youngest before some other ones came on, and they was like kind of older than me. So, you know, I get in trouble because I know they are coming around and help me out.

But I just want to say that I ain't perfect, and I did some things that I got to be accountable for. I did some things that, you know, it's not what they say I did, but I did some things. I did some things. I'm going to fight -- I'm going to fight every day of my life to get back to my children. I love my children more than anything. I look at -- I look at Shawanda and I laugh because she, you know, we have been through some things and she used my kids to get at me, and I always go right back, because that's my kid. That was my red flag right there. I threatened to take the kids, I'm going back home.

But when I was out there doing bad, Your Honor, I did do good. I helped the community. I gave to the church.

They -- I gave money to the church through my company,

through my property, I run real estate company.  I gave money

to the church.  Um, there was cashiers check receipts and

evidence of these that I did.  And I'm not soliciting God's

word, I'm looking for to use God as a token advice, but I

came up here to just speak the truth.

Where they are trying to put me at, Your Honor, that

ain't me.  I did things but I ain't did all those things that

they said I did.  I'm -- in this conspiracy that they put me

in, don't know none of these people but one person, and that

was Ernest Chaplin.  And I only know him because one of my

friend's is his sisters -- is, um, my friend baby mama.

Never had no dealing with these people, never had no dealings

really with these people.  I'm at the bottom of the

Indictment, but they are trying to make me the head of

everything.  They are trying to tell you that me, a man with

eleventh grade education, a GED, um, one year electrician

school, they are trying to say that -- don't even know how to

speak Spanish, that I controlled all these people, all these

Spanish people.  These people are walking off with 10 years,

eight years, seven years, they are trying to get me life.  Do

you think that's fair?  I mean, it ain't fair, and you've got

to stand up for your responsibility because in the Bible

John -- Galations 6:70 said, Be not mocked, for God is not to

be mocked.  You are going to reap what you sow.  You are

going to sow what you reap.  It says that plain and clearly.

When I came in here, I didn't even put my trust in a man, through the whole trial I should of speak up then, but I was saying, God going to work it out, whatever God got for me is going to happen.

So whatever you decide to do today, I know that it's not you, it's God, because I believe that God moves in everybody.  When we look at Romans 8:28, All things that work for the good of those who love God are called according to his purpose.  All right, when you think about that, they say for the good of those who love God, but it's not your good, it's for God's good.  If I loved God, then if God got something for me to do, and maybe he got a prison ministry to do, maybe he got something for me to do up the road, maybe he got some people for me to touch, whatever he got for me to do I'm going to have to do.  So I know it's not you that is rendering this verdict on me.  I know it's not that the prosecutor can say, I know there is nothing that my lawyer couldn't do that would have changed up what God had planned for me.

Now, the only thing I ask you to have consideration is my children.  They love me; I love them.  It's going to be a lot of wet eyes tonight, but we've got to own up to our responsibilities sometime, someplace.  Maybe if somebody had turned me around and kicked me a long time ago, things would

have been different.  But we've got to own up to our
responsibility.  And I don't want to be taken out of my
children's life for a long process of time.  I won't be able
to -- if you can talk to any of my kids, they will tell you
who their daddy is.  They will tell you all the things that
their daddy did with them.  They will tell you how their
daddy has been there and everything.  They will tell you all
these stuff.  But, you know, like I said, we've got to reap
what we sow.  I just won't be able to still be a part of
their life.

Even if you decide to do what the prosecutor wants
you to do, then I know that, you know, Philippians 4:13 said
We can do all things through Christ.  So I know that Christ
has got me.  I know he'll make a way.  I have been -- I used
to take care of my children out there the best way I could.
Now if all these stuff that they say I did, over 500 kilos or
something, or whatever that, then my mama's house would have
been paid off.  My sister wouldn't be living in an apartment.
My sister's house wouldn't have just -- she wouldn't have
just got help with her foreclosure -- no foreclosure had been
at her house.  My baby mama wouldn't be on Section 8.  My --
all these people -- all of my baby mamas wouldn't be going
through financial trouble right now, from Florida all the way
down to --    you know, I did what I did to an extent, not
to what all they say that I did.

1          I just ask you, if you are a praying man, pray on

2     it.  Ask God what you should do.  I'm not looking for a walk

3     out of here, you know, thing, but I don't know what God got

4     for me, I just looking for some compassion, some mercy.

5          If you look at everything -- you see, the things

6     that they don't talk about is that, all right, I got a

7     record, but a lot of things that I didn't do that I just been

8     at the wrong place at the wrong time.  I'm a friend type of

9     friend.  If my friend calls and they need me I'm going to try

10     to be there. If I ain't never gave a ride, I would have never

11     been here.  They -- if you look at everything they had, they

12     ain't never had no -- they said they had some -- they knew of

13     me since 2002, 2004, Detective Rod said, DEA Rod said.  They

14     ain't got a picture of me, you ain't got a thing.  Am I that

15     high up that you can't -- you can't even see me, that you

16     can't investigate me?  And through the whole case you say

17     that you had -- I was the man, um, the person that you was

18     going after.  You couldn't have buy/busted me if I was doing

19     the things that y'all said I was doing.  Y'all could have

20     sent anybody at me if that was the case.

21          But like I say, Your Honor, I'm not here to go

22     through all the stuff that happened, but I just want to point

23     out some things, how I became the head of this stuff.  I

24     became -- I got black people working for me and I got

25     Mexicans, Spanish people working for me, working under me,

not their cousins, not their brothers, not the Mexican

cousins, brothers or nothing, but I got them working for me.

I can't even -- I can't even get -- I can't even get a, um,

what you call the stuff?  A passport.  I never been out of

this country.  I have been to Boston, back down here.  I have

been to Florida.  I have gone to Walt Disney with my

children, thank God for that, before I come in here.  But I

ain't never been out of this country.  I don't even know how

to speak Spanish.  They said a lot of lies.  They said I

been -- I been in Mexican prison.  I ain't never been in

prison down here when this happened.

I -- I always had God to bless.  So the things

that -- you know, sometimes you get through with things and

then God allows you to come back someplace down the line.

And I chalk it up.  I say, you know, for all the things I

got, then this is the things I'm going to have to go through

right now.  This is the things I'm going to have to go with.

My children still going to be blessed.  I'm still going to be

able to call them, talk to them on the phone.  God will make

a way for them to come see me, come up.  I'll be able to hold

them.  I ain't dead, that's one thing that I thank God for,

I'm not dead.  They -- you know, a lot of people can't say

that.  A lot of people can't say that.

When I came in here, I used to tell my family

Proverbs 21, he said that The king's heart is in the palms of

1    his hand.  He turned -- like the water flow, he turned to

2    whatever way he wants to.

3            So like I said then, don't beat yourself up about

4    nothing.  You only can do what God wants you to do.  So let

5    God flow through you.  Let God do what he want to do through

6    you.

7            I thank you for letting me talk.

8            THE COURT:  Mr. Gibbs, thank you, sir.

9            MR. CONDON:  Your Honor, I do have -- I've got a

10   statement from Pastor Theodosis Jordan (ph).  I would like to

11   pass it up.

12           THE COURT:  I'll be glad to receive it.

13           MR. CONDON:  I would read it, but it's pretty

14   detailed.

15           THE COURT:  Okay.  Mark this as an exhibit, please.

16   Thank you.

17           (Pause in proceedings.)

18           THE COURT:  I've read it.  Yes, Mr. Condon?

19           MR. CONDON:  Your Honor, that would be our -- other

20   than additional argument, that would be our witnesses with

21   regard to our motion for --

22           THE COURT:  I think we've about covered most of the

23   courtroom here.  I've enjoyed every one of them, frankly.

24           MR. CONDON:  Make sure I got everybody who wants to

25   speak.

1          THE COURT:  Thank you.

2          Mr. Phillips, from the Government.

3          MR. PHILLIPS:  Yes, Your Honor.

4          Before I go into my remarks, my argument is going to

5     be addressing the appropriate life sentence potentially, but

6     also recognizing the Court has the discretion to go below

7     that.  So, you know, all these things I'll be talking about,

8     you know, are pertinent obviously to anywhere you may go

9     below that if you choose to.  So again, that's where we are

10    starting from because that's where the Guidelines through

11    the --

12         THE COURT:  I take it the Government's view is that

13    I should impose life?

14         MR. PHILLIPS:  Your Honor -- well, I'll get to

15    that.

16         THE COURT:  Okay.  You know, I told Mr. Gibbs to say

17    yes or no earlier, so why don't you answer that question yes

18    or no.

19         MR. PHILLIPS:  Well, it -- if I can have time to

20    set it out, I would like to explain.

21         THE COURT:  Go ahead.  I'm giving you a little bit

22    of a hard time.

23         MR. PHILLIPS:  Because this is not easy.  I know

24    it's not easy for you.

25         THE COURT:  It's not easy for me.

1          MR. PHILLIPS:  And I'll tell the family and

2    Mr. Gibbs and anyone that knows me, the agents that work with

3    me know that any time someone is going to prison, you know,

4    it's not easy.  It's not easy.

5          THE COURT:  You know Mr. Phillips, Mr. Gibbs has got

6    up and said, I've done wrong, I should be held accountable.

7          MR. PHILLIPS:  So there is no question life is

8    harsh.  Mr. Condon used the word harsh and there is no

9    question.  And there is no question that -- therefore, there

10   is no question whether that's sufficient, clearly it would be

11   sufficient, it's the highest sentence you could give.

12          And of course as you've noted and pointed out, the

13   question is whether it's greater than necessary, and my

14   comments will sort of -- will discuss that from the

15   Government's perspective.

16          And as I said, this isn't easy.  It's never easy for

17   anyone because any sentence punishes not only Mr. Gibbs, but

18   as I've heard Judge Duffy, who I had the honor to work for,

19   said many a time in sentencing that he sentences not only the

20   defendant but the entire family, the nine children and all

21   the family members and friends that have talked today.  And

22   that's a hard thing.  And you've heard from them today.  And

23   Mr. Gibbs has more going for him than sometimes sadly a lot

24   of defendants that come to court have, probably the majority

25   of sentencings there will be a defendant by themselves with

1    no family facing, you know, harsh sentences, but no family

2    that shows up.  So he has that going for him.

3            THE COURT:  He has a wonderful family.

4            MR. PHILLIPS:  Yeah, and I recognize that, from our

5    perspective.  And you heard from them today, as you should,

6    but I'm here to speak for those that aren't here today, Your

7    Honor, and I say this with no --

8            THE COURT:  I mean, you know, Mr. Phillips, you are

9    about to get into this, I'm concerned about all those

10   children in those neighborhoods who are being polluted by

11   these drugs and the destruction of their lives, and I worry

12   about them.  You know, and there are tremendous consequences

13   associated with drug dealing.  And, you know, I think there

14   is -- it's appropriate that we consider the impact on the

15   community, the good with the bad.  I think it's great that

16   Mr. Gibbs tithes to his church, that's a great thing, but was

17   that the proceeds of drug money and a great deal of suffering

18   and bad that went to produce that?  So we've got to weigh all

19   of this.

20           MR. PHILLIPS:  Yes, sir.

21           And I say these things with no hint of irony or

22   sarcasm, I mean, I truly believe it, I mean, I am here to

23   represent the people.  I wish we did it like New York where

24   they say that the people, the State of New York as opposed to

25   the way we do it saying the Government, but I say these

things just to give some context of things.  I mean, of course it is the Government for the people by the people, of the people, and the Government's here for those folks that aren't here today.

You know, one of the -- one of the ministers that spoke talked about another chance for Mr. Gibbs.  And certainly that's something the Court should consider, but as a spokesperson for the people and all people, and that would be my only comment to Mr. Cohen's comments, and that is that I represent, we represent, the folks on my table, and I'm confident and I wholeheartedly believe that we represent all the people.  We didn't choose Mr. Gibbs for any other reason other than what the evidence told us, and not for his race or anything else.

THE COURT:  Actually, this conspiracy was sort of an equal opportunity employer.

MR. PHILLIPS:  It was.

And I would -- if someone were to look at my indictment record, I think I'm an equal opportunity prosecutor, as well.  So I wanted to say that, but I'll leave that for something else.

But the chances -- what are the chances for those nameless and faceless victims, you know, the addicts who have made their choice to use these drugs, but they had children, too, and they were affected by it.  And you've already

 1     touched on that, but it is something that I think we have to

 2     say every time and we need to mention that, to the victims of

 3     the violence of the drug trade.  And in my brief I talked

 4     about, we are not talking about the victims in our community.

 5     There is the drug dealers themselves that are killing each

 6     other.  And we are not saying -- and again, another thing

 7     that I'll put in this box, there is no allegation that he was

 8     directly involved in any violence.

 9                THE COURT:  You know, I've got to say that one thing

10     I noted, I mean, you know, there was an appropriate

11     enhancement because he possessed the gun, but -- and he had a

12     prior history as a young man of having crimes of violence --

13     but there is no evidence -- and I listened very closely

14     during the trial of this -- that he was running a network of

15     terror or anything like that.  That, you know, one normally

16     thinks about major drug trafficking operations having a

17     healthy dose of violence as part of it.  And, you know, we

18     just didn't see that regarding Mr. Gibbs in regard to the

19     conspiracy that you put up at trial.

20                MR. PHILLIPS:  Yes, sir.  And I agree with that,

21     any direct evidence of his direct involvement.  But what we

22     do have is evidence of large scale drug trafficking in that I

23     think it's --

24                THE COURT:  Large may be an understatement.

25                MR. PHILLIPS:   And it's appropriate for the Court

to consider, but although there is no evidence tying directly
anything, certainly the Court can consider, when you take
this stuff in and put it out, that certainly that's the
consequence, that those are going to be the consequences.  We
are not talking about -- we are talking about drugs and
cocaine and that's turned into crack and cocaine that's
abused, and all those things.  And it stretches from our
community all the way back to Mexico.  And people supplying
it to Mr. Gibbs, you don't have to look very far to see the
violence and what that has waged on that country.  So there
is an accountability, we believe, and a responsibility to
hold him accountable for what he put out there.

THE COURT:  And appropriately the Guidelines are
very high --

MR. PHILLIPS:  Yes, sir.

THE COURT:  -- in recognition of that.

MR. PHILLIPS:  Yes, sir.

And so some of my comments are going to focus -- I'm
not going to spend too much time, it's clear everyone --
well, we agree on the seriousness of the offense, and I think
our brief addresses that I think adequately, and I'll leave
it at that because I don't want to beat a dead horse.

What I'm going to do now, though, is sort of respond
to some of the other things that have been raised and talk
about, you know, what the overwhelming evidence did show and

some of these questions that were raised.  You know, there

was a question raised about where is the money?  And as you

correctly noted, we certainly would like to know where the

money we believe was gained in these illegal activities is.

And sometimes we get it; sometimes we don't.  But it's not as

simple as saying, Oh, this is ludicrous, because if I had 500

kilos all these people would be living the high life; I would

be living the high life.

First of all, a smart drug dealer isn't going to

live the high life to too much of an extent to bring

attention to themselves.

Second of all, 500 kilos, he didn't make a net

profit on that.  They cost 28, 30,000 per, and he would make

2 to 4, you know, just based on our experience.  So that is

still a significant amount of money, 500, if you are making

2,000 per kilo would be about a million dollars, but that's

over a period of time.  And you've heard about nine children

which I'm sure he's provided for.  He has a very expensive

pickup truck, Mercedes, BMW, was renting a house which was

not a cheap house, attorneys, paying for attorneys during the

course of this conspiracy.  So that money can go pretty

quick.  And I just point that out because I just don't think

that is a starter to suggest that his involvement was less

than what it was.

And when Mr. Gibbs spoke -- and this goes to my

concerns about deterrence and things along that line -- of
course he doesn't have to admit anything and he has admitted
that he did wrong and that was a step that I didn't expect,
and it's the first time we've heard it. And it's saying the
right thing. And I hope -- I hope he means it and I hope he
believes it.

THE COURT: It seemed to me he meant it.

MR. PHILLIPS: And it did. I couldn't see him
saying it in his eyes, but it sounded like he did. And so
he's saying some of the right things, but then he goes on to
denying dealing with any of these folks. And that gets us
back to these concerns, you know, he denies -- we have him
intercepted with speaking to Pedro Ochoa. We have text
messages with Nene.

THE COURT: He's got Timothy Maldonado's gun.

MR. PHILLIPS: Maldonado's gun and Waiters in the
car. So it stretches credibility to say, I had nothing to do
with these folks or any dealings.

THE COURT: Mr. Phillips, I hear what he's saying
is, is that, okay -- I don't want to put words in his mouth
because he was careful not to go any further than he needed
to and I respected that under these circumstances -- but he
was basically saying, okay, I was involved in some of this, I
just wasn't as big a cheese as the Government made me out to
be. That's fine for him to take that view.

1        MR. PHILLIPS:   I understand.

2        THE COURT:  He may be bigger than he appreciated he

3   was frankly.

4        MR. PHILLIPS:   But I think it's fine for him to

5   take that view, but you can certainly consider that in --

6        THE COURT:  He's not --

7        MR. PHILLIPS:  -- in light of the evidence.

8        THE COURT:  He's not getting acceptance of

9   responsibility or anything, so it doesn't matter.

10        MR. PHILLIPS:   I think that's an appropriate factor

11   to determine significant deterrence to him.  And the only

12   other things I wanted to note, he's got the enhancement for

13   the obstruction, but those are the actions not of someone who

14   is trying to get Mr. Waiters to take it through his attorney,

15   and his objections Dalarna Nelson's name has been, maybe they

16   were her drugs, which again stretches credibility.  I mean,

17   that's a bit --

18        THE COURT:  Let me say this --

19        MR. PHILLIPS:  -- that's tough.

20        THE COURT:  His counsel making suggestions like

21   that, he's got to defend his client.  I didn't hear Mr. Gibbs

22   get on the stand and blame Ms. Nelson --

23        MR. PHILLIPS:   Okay.

24        THE COURT:  -- get up here today at sentencing and

25   blame Ms. Nelson.

1              MR. PHILLIPS:  One other thing I wanted to point

2    out, we never alleged he went to Mexico.  He didn't have to

3    go to Mexico; Mexico came to him.

4              THE COURT:  He did go to Atlanta, we know that.

5              MR. PHILLIPS:   Atlanta.

6              And if I remember correctly, it's -- there was a lot

7    of information in the case -- but there was some meetings in

8    Charleston, as well, but early on.  And we didn't -- we

9    didn't allege that he was organizing or dictating anything to

10   the Mexicans.  I mean, clearly their part of the pie they

11   were in control of, but he was in charge of folks here,

12   and --

13             THE COURT:  Read the ledger sheet.

14             MR. PHILLIPS:   Yes, and recruiting distributors and

15   the like.  And that's the basis of that.  And I don't want

16   any confusion over that.

17             So briefly going through what Mr. Condon has argued

18   in his brief, some of the issues, he cites the 21 years for

19   the killer in Norway, I would just ask --

20             THE COURT:  Don't waste your time.

21             MR. PHILLIPS:   That's -- that's a nonstarter,

22   that's something completely different and a whole different

23   system.

24             You know, there has been mention of what other

25   codefendants have gotten and the disparities between

codefendants. Well, those other codefendants, none that have
been sentenced, were at the level that the evidence showed
Mr. Gibbs was. So that's issue number one that's not in
disparity.

THE COURT: A number of them had 5K's.

MR. PHILLIPS: And that was the next. They all
pled guilty, so some of them got a reduction just for
acceptance of responsibility, and many of them cooperated and
received consideration for their cooperation. So you can't
really compare them. You know, the only person at this point
who got convicted, I think at a similar level would be --
Pedro Ochoa has not been sentenced yet, I believe he's facing
approximately around 28 years under his Guidelines, but of
course he cooperated and you heard him testify, so he's in a
different situation, as well. And they were at a similar
level.

But what I -- to go to the seriousness of the
offense and go to Mr. Gibbs's role particularly, I would
submit that Ochoa and Gibbs are at a similar level, but there
are distinct differences between them. They were moving
similar amounts of weight, but Ochoa, to just make sure it's
clear for the Court, was still a middleman in many ways. And
as a cell leader, a Mexican cell leader, I've seen these
cases develop, he was a person that had command and control
of Mexico and was distributing to mid-level and local

distributors here, and he was taking his orders from elsewhere.

Mr. Gibbs, the evidence showed, cut out that middleman. And whereas Ochoa had his Nene that he answered to, Mr. Gibbs was in partnership with Nene. And the only answering he had to do was if they lost a load and he owed money in debts and things. It was more of a business relationship. And that would be another explanation where some of the money went. I'm sure they lost loads. I'm sure that people got arrested and he didn't get all his money. So you are supposed to make a million dollars profit, but the drug business has a lot of loss where you have to --

THE COURT: You are always buying the next load.

MR. PHILLIPS: Exactly.

So even then I would put Ochoa at a rung below where Mr. Gibbs was, certainly Nene, some of these higher people that currently are, we believe in another country, are above Mr. Gibbs. They were a source of supply and they would warrant, you know, consideration if you are slotting people where they go. So I think that's important to note. We note that in our brief. And that, again, I believe puts him more directly accountable for what happens in Mexico as a result of this drug trade, and for what happened in this community as far as the amount of drugs that he pumped into this community. And so there is no question that that factor

1       warrants a substantial sentence.

2            As far as the general deterrence, and general

3       deterrence for the -- as we note in our brief and we tell you

4       from experience, there are not many Marcus Gibbs at any given

5       time in Charleston.  When he's arrested, when anyone at a

6       similar level is arrested, we always learn that it does make

7       an impact.  It's a temporary impact, unfortunately, but it

8       does make an impact on the drug market in Charleston.  When

9       individuals at his level go away, we always get reports later

10      on that there was a drought in this time of 2010, and you can

11      tie it directly to folks of his stature being taken off.  So

12      there are only a few of those folks at a time, and there is

13      certainly a need, but unfortunately, we take them off; more

14      fill in.  So we need that general deterrence.  And a

15      significant sentence in this case is necessary for that

16      general deterrence.

17           THE COURT:  Well, Mr. Phillips, I've read your

18      brief, and I don't think that you are going to have trouble

19      persuading the Court that a significant sentence is required.

20      The question is:  How significant a sentence?

21           MR. PHILLIPS:  Yes, sir.

22           THE COURT:  And I've read -- I mean, you can go

23      through all these -- all the factors under 3553, and I'm not

24      going to have any quarrel with you, the question is:  How

25      significant -- you know, we need to deter.  We need to

1    protect the public, but life versus something less than life.

2              MR. PHILLIPS:  Yes, sir.

3              THE COURT:  How does it address accomplishing the

4    goal of imposing a sentence which is sufficient but not

5    greater than necessary --

6              MR. PHILLIPS:  Yes, sir, and --

7              THE COURT:  -- to accomplish the purposes.

8              MR. PHILLIPS:  I have been working to that.  And

9    that's why I asked for time.  Because as I said, this is -- I

10   take my duty as a prosecutor -- and I'll tell anyone that

11   listens -- that had a piece of evidence indicated that we

12   were completely wrong, I would have been the first to dismiss

13   the case and bring it to the Court's attention.  And one can

14   believe that or disbelieve that, but I can say that with a

15   clear conscience and heart.  So we take the evidence as it

16   comes.  And in part, I have been working through that as I

17   have been talking, that very question.  And I know it's not

18   for lack of preparation; it's for the difficult issues that

19   we have before us.

20             Your Honor, but I went through those issues and I

21   wanted to hit those factors because we still have to support

22   whatever sentence is given, and I wanted to give the Court

23   the Government's perspective and the support for that.

24             In this prosecutor's opinion, the factors under

25   3553, while under the Guidelines, I think the Guidelines are

appropriate, I think that there are circumstances where life would be appropriate for this case under these facts for this defendant and what we know, I think in looking at what the Guidelines would have been had a couple of things gone a different way, I think 360 months would be appropriate, Your Honor.  That's 30 years, which is still significant given his age, and I'm sure Mr. Condon would argue that that is a life sentence, but it gives hope that he can get out.  If he does good time and does whatever else, that he has a chance to -- his children obviously are young -- he can spend time with his children.  It's certainly better than life.

And I do so, again, there is other prosecutors, there is other cases down the line, solely based on the facts of this case.  There may be a situation very similar to Mr. Gibbs in the future, but we would argue, or I would argue life would be appropriate, but given his lack of evidence --

THE COURT:  My obligation is to take one case at a time.

MR. PHILLIPS:  Yes, sir, and as is ours.  But I just -- you know, I don't represent me, again, I represent -- the things that I do can affect others, so I do it with that caveat.  But, you know, given his lack of direct involvement, though he did have the guns, and you have -- you know, a lot of times folks dealing in the amount he did need guns for protection, and there is certainly the risk of violence.

1     That I think is encapsulated in a sentence of 30 years.

2          I will tell you I don't believe -- and I didn't come

3     to that conclusion lightly or a long time ago, in some ways I

4     came to that conclusion as I have been talking here.  And

5     again, that's not for lack of preparation, it's because, I'm

6     sure as you have in this situation, you've probably gone back

7     and forth.

8          THE COURT:  The one thing I do is I come to the

9     hearing to hear the evidence and you heard the evidence from

10    the family for the first time yourself.

11         MR. PHILLIPS:  Yes, sir.

12         THE COURT:  And you know, I come with an open mind

13    to hear all the evidence.

14         MR. PHILLIPS:  And I do that, but it's -- I mean,

15    it's firm in that concession, if you would, from the

16    Guideline range.  You know, I firmly believe and I'm solid in

17    my belief that a day less than 30 years wouldn't be

18    appropriate when you consider the Guideline range, but it

19    does give hope, it does sufficiently address the 3553

20    factors, and it doesn't do so greater than necessary for the

21    reasons that I've spent the last however long talking about.

22    Because it -- it's still a significant case.  And as you

23    said, we've heard from the family, which is a good family, it

24    sounds to be, but we didn't hear from all these other

25    families.  So I think on their behalf a sentence of 30 years,

given his involvement, would be appropriate in this case, Your Honor.

        THE COURT:  Thank you very much.

        Mr. Condon, anything in reply?

        MR. CONDON:  Your Honor, obviously a 10-year sentence would be severe in this case.  Mr. Gibbs is 40 years old.  You know, when they did all these wiretaps, there was only a tangential number of wiretaps, you know, or phone calls dealing with Mr. Gibbs.  And I just want to bring that out because just to show that there just a tangential connection with regard to the Mexican situation.  But 10 years he would -- he's 40 years old, he would be 50.  I think the thing that people forget about is that supervised release, there is -- that in itself you can hang an additional time over his head, 10 years or more with regard to supervised release so that in effect he's in custody for 20 years.  He's being accounted for during that supervised release time.  So I think, you know, 10 years deterrence, protection of the public gives hope in terms of rehabilitation.  It does meet the factors of 3553(a).  I think that that -- that's why it was important about the mandatory minimum.  It makes a big difference when you start thinking about, you know, that 10 years would be an appropriate sentence; whereas before, you know, the 20 years would be basically almost a life sentence for someone of his

age.  But I think it gives him hope, gives him a chance to

rehabilitate himself.  That's what I think you saw today, him

accepting responsibility.  He's got a loving family around

him.  And also, it's amazing how much he affected people

while incarcerated.  They come to him for help and advice and

he's touched their lives.

THE COURT:  I don't have much doubt about what I've

heard about Mr. Gibbs, that he is going to be having a prison

ministry wherever he is, and you never know what your calling

is going to be and where you are going to touch people.  And

maybe there is no group of people more needy of the insights

he might be able to offer than right there in prison.

MR. CONDON:  Well, I think as we learned it, you

know, today, when you are faced with your responsibility, you

take up your task and your job wherever you are.  But I think

10 years is very appropriate in this case.  I think that

there is no evidence of violence.  There is, you know, a

situation where you have a tangential connection based on

these wiretaps.  I think 10 years would be a significant

sentence and this would accomplish all the goals of 3553(a).

MR. PHILLIPS:  Judge, if I may briefly respond?

I think from life to 10 is -- because in some

respects the things that I've listed in the brief, the things

I've talked about today, the things that we've talked about

under 3553, and I think the Guidelines are dead on in this

case, that he deserves life for what he's done.  But then the question is not that, it's whether the factors and the things that you are supposed to consider can be accomplished with something less than that.

And so I urge the Court to, when thinking, when listening to the argument to go from life to 10 years, that's what we are talking about, we are not talking -- this isn't a negotiation of 30 to 10 --

THE COURT:  Mr. Phillips, Mr. Condon is just doing his job.

MR. PHILLIPS:   I understand, but from the Government's --

THE COURT:  He's arguing on behalf of his client and he's doing exactly the argument I expected him to make and you are doing the argument I expect you to make.  So focus on the merits.

MR. PHILLIPS:   Yes, sir.  Well, but I just want to give it the proper context, talking about from life to 10, I think that would be grossly unjust.  And again, when we -- when I came to -- very rarely do I say an amount, but when I say 30 years, that's, I'm looking at Guidelines.  If you took some of the enhancements away, had he won some of those, he would be at 360 to life with the drug weight or close to that.  And really in my view, the amount of drugs that he put into the community, if you just look at that Guideline range

where he would be, he would either be 360 to life or 324 to 410.

THE COURT:  Yeah.  38, with a Criminal History of V, he's 360 to life without any enhancements.

MR. PHILLIPS:   That's -- I didn't pull that out of an old cloth, that's sort of why it came to me that that might be an appropriate sentence because you just can't ignore that part of the seriousness of the offense.  But it's not a situation where I think a day less than 30 years given the seriousness of the offense would be appropriate under 3553.

MR. CONDON:   Your Honor, I just want to again --

THE COURT:  You want to get the last word.

MR. CONDON:   And I think Mr. Gibbs wants to address me.

THE COURT:  I'll be glad to hear from him again.

MR. CONDON:   You know, I did so some research on variances and the Courts have become more amenable, obviously since the -- since the Guidelines have been advisory, but I came across a case out of the Eighth Circuit, *United States vs. Feaster* (ph) where there was a 360 guideline range and it went down to the mandatory minimum 10 years in that case.

So I mean what I'm saying is, is that there is flexibility in the system, there is discretion in the system that wasn't there before, and I think in this situation a

mandatory minimum of 10 years would be appropriate.  And I
know Mr. Gibbs did want to --

THE COURT:  I'll be glad to hear another word from
Mr. Gibbs, yes.

THE DEFENDANT:  Your Honor, truthfully, I don't want
no time, but you know --

THE COURT:  I would expect nothing else.

THE DEFENDANT:  I want time served truthfully.  But
if I had to get time with the Guideline, the statutory, I
would love to have the 10 years.  And like I say, if Your
Honor do something good, you can hold supervision release
over my head, you can hold 20 years, you can make a
stipulation that if I get in anything after I'm released,
that I got to serve the whole 20 years.  You can do this
thing because you are the Judge.

But I want you to look at something else.  When I
did get locked up, when I went into Leeds Avenue, if you take
the time, you call Chaplin Smith, you call the discipline
board, they will tell you that Mr. Gibbs ain't -- he was in
there, he was doing -- he was -- if you could be a good
samaritan and inside the devil's playground, if you can be
inspiration to somebody inside the devil's playground, but
Mr. Gibbs sign up for DAODAS and graduated.

I understand that the things that we do in our
community affects other people.  You know, coming through

life, people didn't realize -- well, I'm talking about me, I
didn't realize some of the situations that I put myself in,
some of the things that I did affected other people.  If I go
to the club and I fight, um, I affected the people who was at
the club, the owner of the club, um, the patrons at the club,
I affected the person who got to go home bruised up, or I go
home bruised up, if I go to the doctor, it affects everybody,
it affects other people, that's where we learn in the victim
crime impact class.  You know, they only give you three days,
it wasn't nothing that they -- I went to learn.  I went to
try it.  I know there is programs up in the penitentiary and
I'm going to get in these programs.  I'm going to try to get
in these stuff.  I'm going to try to better myself.  I'm
going to try to take a chance that God given me that I didn't
take back then.  I'm going to try to educate myself and try
to get a trade.

     And people took -- my family loved me.  When I told
my sister I wanted a property management company, I was going
to try to -- I was going to Atlanta, Shawanda in Atlanta with
my children, so I ran behind her.  I was going up to Atlanta.
And I got into this property -- I got with my uncle and we
started doing this property manager.  I talked to my sister
and she lent me $10,000 to get into this program.  She went
in her bank account and drafted me $10,000 to get in this
stuff, to buy foreclosures houses and stuff.  There was

houses, there was condominiums in Atlanta going for $710,000,

condominiums that -- homes would have been worth 135, 150

something.  But right then Atlanta was doing bad on their

economy, real bad, and the houses was little or nothing.

So we got up there and we got a couple of houses.

We was going through -- well, I don't even know if this is

legal, but I don't know if this is legal or illegal, but we

was going through people, and people who got houses and

they -- they -- we will get the houses from them, we'll take

over their houses and have them sign over the bill of sale,

take over the houses and take over their loan and pay on

these houses and pay up a couple of years and got the equity.

This is the stuff that my uncle teach me in the business

world because he was manager of a bank and he knew these

stuff.

So I want to learn.  Maybe this is the break that I

needed.  I'm going to miss my children regardless of what you

do, but I know I've got to do something to pay back to this

community.  But I ask you if you gave me -- if you throw

yourself on the mercy of the Court, I throw myself on the

mercy of the Court, ask you if you could just give me the 10

years and put a bunch of probation over my head when I do get

out.  Then if I do go down the wrong road, then I'll be back

where I supposed to be at.  But I don't believe this is where

I'm supposed to be at.  I believe that I did things and I

believe that I done got to the age that I'm ready to settle
down.  I'm ready to do the opposite.  Fall in the crowd
sometimes and, you know, our community, the way that we was
brought up, the things we see on TV, fall in these stuff.
You know, I don't want to blame the rap and all that, but the
things we see, the cars, the good life, the lavish life, you
know, we see we try to mimic.  But now that I know these
different things, now that I know my Lord, I know Christ
Jesus, I've got a different aspect.  Maybe it's too late, but
regardless of what you do to me today, I can -- I'm
strengthened through him.  He's not gone.  Sometimes he just
don't take you away from the problem, sometimes he take you
through the problem.  You know, God put into a firey furnace.
God didn't deliver them from the firey furnace, he went into
the firey furnace with them.  He went into the lion's den
with Daniel.  You know, he didn't even deliver his own son
when he cried out to him on the cross.  So I mean, sometimes
you just got to go through things.

But I ask you if you just take the time, you can
call the jail, ask for the -- see what I did when I been in
there.  See all the things I did.  See how I carried myself.
I know we are accountable for things we do, but Your Honor, I
just ask you, you know, for the sake of my family, for my
children, 10 years and a lot of probation, that will be
reasonable.  Put a stipulation on me.

I know the rapper T.I. he had to do things for the community. He had to go talk to younger people. He had to give back to the community. You know, these are the things that instead of a harsh sentence that you all can put on people, that you can use a person like me to give back, to tell youngsters, listen, man, I did this here. I went this life. I fall in the fast life. It ain't get me no place but away from my children, crying at night -- see people -- people hear these fantastic stories like, um, you know, like the ghetto superstar and stuff like that with these stories. These stuff that they do, you hear the good side, you hear about the money, you hear about the cars, but they don't hear about the part where you are in jail and you are away from your loved ones, you are crying at night and you can't get a phone call through. You've got people who is trying to come at you the wrong way when you are trying to do good. Because when you are in jail and you are trying to do good, man, there is some of the people who are going to try to take that good as a weakness. So you don't hear about all that stuff.

You know, I always been the type of person who -- I used to look out for people, but these last year, things change. I'm the one that who got to be humbled. I've got people coming at me because I carry myself as a man of God, and I've got to be humble because I've got to represent me and God. I've got to teach things. Somebody takes up with

1    me, I've got to tell them, well, you know, you've got to

2    handle that.  So I mean, yeah, I probably need -- I know I

3    need this here, I know I need some time.  I know I can take

4    advantage of the situation.  But I ask of you not to be

5    rational -- not rational, I'm not asking you to be extensive

6    with the time, I'm asking you to just think about it.  You

7    know, like I said before, pray on it, and you know, I accept

8    whatever you give me.  I've got to.

9              I thank you.

10             THE COURT:  Thank you, Mr. Gibbs.

11             Anything further, Mr. Condon?

12             MR. CONDON:  Your Honor, obviously when you impose

13    time, if you could recommend any drug program that he may be

14    eligible for, as well as an institution in South Carolina.

15             THE COURT:  I was going to ask you about that

16    because I know that the family is going to want to visit.

17             MR. CONDON:  Yes, sir.

18             THE COURT:  Of course I don't control the Bureau of

19    Prisons on either of those matters, but I can make a

20    recommendation and I certainly intend to do that.

21             MR. CONDON:  Yes, sir.  And I did want to make this

22    letter of March 23rd, 2012 a part of the record.

23             THE COURT:  Please.  If you will give it to Ms.

24    Ravenel, she'll mark it.

25             THE CLERK:  Court Exhibit Number 2.

1          THE COURT:  Well, I have the unenviable role of

2     deciding sentencing here.  And I don't think any judge

3     relishes sentencing, the sentencing role, but it's part of

4     our responsibility and I intend to do it and follow the law

5     as Congress has provided to me and our court precedents have

6     provided.

7          I will make some general statements.  I'm going to

8     then pronounce sentence and then I'm going to state a fuller

9     justification for the sentence in the record.

10          The Guideline sentence for Mr. Gibbs, of course, is

11     life.  He is at a level 46 and up through -- the top of the

12     chart is 43, it's life across the board thereafter.  And if I

13     were simply to follow the Guidelines, it would be life.  In

14     fact, I would need to depart downward four levels just to get

15     to 360 under the Sentencing Guidelines.

16          I've studied with a considerable amount of care the

17     specific methods by which the Guidelines got us to 46.  And

18     the reason we can vary and seek to impose a sentence which is

19     reasonable, which is sufficient and not greater than

20     necessary, is that sometimes you just can't put all life's

21     experiences on a grid and get the right answer.  It's a good

22     place to start, we've started there, but I think life is too

23     much here.  I just think it's too much.

24          And the question then is, what's the appropriate

25     sentence?  And I have been very impressed with the family and

friends and the defendant's prison ministries activities, all
of that is interesting and important and it is part of the
reason that I am prepared to vary from life because I think
he should have hope and I think we all should have hope that
there is a better course.

But I equally have a concern about the impact of
what he's done on the community.  And Mr. Gibbs made
reference of his having greater insight into that.  What is
going on with the distribution of drugs in our community and
its impact on young people is heartbreaking.  And Mr. Gibbs,
if you had asked, if he had thought about the impact of what
he was doing and the way it injured his community, I'm sure
in reflection he never would have done it because it affects
and it injured people just like his nine children.  And
that's the thing that is so tragic.

So part of what I have to look at is to make sure
that we deter this type of conduct.  That people who look to
say, I want to be like a drug dealer say, well, you know,
there needs to be a significant punishment associated with
this so that that is not a path people would want to follow.

I need to impose a sentence that promotes respect
for the law, provides just punishment, provides an adequate
deterrence and protects the public.  So I've got to weigh all
of these different factors and I think that it is necessary
that a significant sentence be imposed for what was done,

what was proven, what I'm satisfied was criminal conduct in
which the defendant was involved, and it needs to be balanced
by mercy and by imposing a sentence which is sufficient but
not greater than necessary to impose -- to affect the
purposes of the act.

So with that I'm going to pronounce the sentence and
then I'm going to give a greater statement to justify my
variance under 3553.

Having calculated and considered the advisory
Sentencing Guidelines and having also considered the relevant
statutory sentencing factors contained in 18, USC, Section
3553(a), it is the judgment of the Court that the defendant,
Marcus D. Gibbs, is hereby committed to the custody of the
Bureau of Prisons to be imprisoned for a total of 360 months.

Such term consists of 360 months as to Counts 1, 4
and 5, 240 months as to Count 3 and 120 months as to Count 6.
Said terms to run concurrently.

It does not appear that the defendant has the
ability to pay a fine; therefore, a fine is waived.

The defendant shall pay the mandatory $500 special
assessment fee.

Upon release from imprisonment, the defendant shall
be placed on supervised release for the term of life.  Such
terms consisting of life as to Counts 1, 4 and 5 and three
years as to Counts 3 and 6.  Said terms to run concurrently.

Within 72 hours of release from the custody of the
Bureau of Prisons, the defendant shall report in person to
the probation office in the district to which the defendant
is released.

While on supervised release, the defendant shall
comply with the mandatory and standard conditions of
supervision outlined in 18, USC, Section 3583(d).  The
defendant shall also comply with the following special
conditions:

Number one, the defendant shall submit to substance
abuse testing and/or treatment as approved by the United
States probation officer until such time as the defendant is
released from the program by the probation officer.

Number 2, the defendant shall provide the United
States probation officer access to any and all requested
financial information including, but not limited to, income
tax returns.

I recommend that the defendant be admitted to a drug
treatment program.

I further recommend that his incarceration, if
possible, be in an institution in South Carolina or as close
as possible to South Carolina to allow his family ease of
access for visitation.

Now, I want to address, if I might, the basis of my
variance from the life sentence down four levels in the chart

1    to a sentence of 360 years -- 360 months.

2             I start with the statement that my obligation is to

3    impose a sentence which is sufficient but not greater than

4    necessary to comply with the purposes of the act.  This must

5    be done on an individualized basis.  I have considered all

6    the factors under 3553(a) including and given special weight

7    to each of these factors.  I've considered the nature and

8    circumstances of the offense.  This was a major drug

9    trafficking operation and I think it did immense injury to

10   the community, and there is overwhelming evidence to support

11   that Mr. Gibbs was an organizer and a leader of a major drug

12   trafficking operation.

13            I've considered the history and characteristics of

14   the defendant, his long history of criminal activity, his

15   level V Criminal History out of a total possibility of VI,

16   that obviously weighed heavily, as well.

17            I've considered the seriousness of the offense.  I

18   think it's beyond dispute this is a serious offense.  I

19   believe someone who is engaged in such a major drug

20   trafficking operation, it's necessary to impose a significant

21   sentence to promote respect for the law, provide just

22   punishment, provide an adequate deterrence to protect the

23   public.  Saying that, I do not believe it is necessary to

24   impose life to accomplish those purposes and I believe a

25   sentence of 360 months accomplishes those ends.

 1          Now, let me provide Mr. Gibbs a notice of his appeal

 2     rights.  Mr. Gibbs, you can appeal your conviction if you

 3     believe your guilty plea was somehow unlawful -- or I'm

 4     sorry -- you can appeal your conviction if you believe

 5     somehow your trial was -- there was an error or a violation

 6     of your legal rights.  You also have a right to appeal your

 7     sentence under certain circumstances, particularly if you

 8     believe the sentence is contrary to law.  You must file the

 9     appeal within 14 days of the entry of judgment.

10          Further, you have a right to file in forma pauperis

11     and the Clerk of Court will prepare a notice of appeal on

12     your behalf.

13          Mr. Condon, are there further matters to come before

14     the Court at this time?

15          MR. CONDON:  Um, no, Your Honor.  I think what I

16     would do, I'll file a Notice of Appeal, but I think it be

17     best to appoint someone else to represent.

18          THE COURT:  I'll allow -- you know, they can -- that

19     matter can be addressed later in terms of the handling of

20     Mr. Gibbs's appeal.  But I, you know, you may want to do what

21     you can in terms of making a motion to withdraw or whatever

22     and see about the appointment of other counsel.

23          I will say, Mr. Condon, I thought you did an

24     excellent job regarding the sentencing hearing, and I think

25     even Mr. Gibbs after watching the whole thing came to

1    appreciate the effort and the diligence to which you have

2    engaged in this.  I mean, this is probably a sentence that no

3    one is really happy with, but I must say to you that had I

4    simply followed the Guidelines, he would have served life.

5    He would have left at the time of his death and we did not do

6    that.  And I think that there was the argument made to

7    support the variance here of four levels, which is not an

8    insignificant variance because, among other things, the

9    excellent argument made by counsel.

10           Mr. Phillips, anything further from the Government?

11           MR. PHILLIPS:  Judge, just one issue and just for

12   the record to be clean because I'm sure this will be

13   appealed, I want to make sure there is no confusion that when

14   you went from -- when you didn't consider the enhancement,

15   Count 4 -- and you just didn't mention this before, and I

16   just didn't want anyone to think that you may have felt

17   constrained one way or the other -- Count 4 statutory

18   penalties were five, minimum of five and a max of 40 for

19   Count 4.  I know it has no bearing on --

20           THE COURT:  I appreciate you -- I'm fully aware of

21   that.  I simply did the ones that were, you know, the range

22   was 10 to life for me and based on all of the convictions and

23   all the counts.  I appreciate you mentioning that.

24           Anything else?  Very good.  Court is adjourned.

25                      *****     *****     *****

1

2   I certify that the foregoing is a correct transcript from the

3   record of proceedings in the above-titled matter.

4

5

6

7   --------------------------

8

9   Amy C. Diaz, RPR, CRR              September 28, 2012

10  S/  Amy Diaz

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25